FILED
United States Court of Appeals
Tenth Circuit

June 11, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

HOWARD O. KIEFFER,

      Defendant-Appellant.

No. 10-1391

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:09-CR-00410-CMA-1)**

Karin M. Fojtik, Assistant United States Attorney (Carlie Christensen, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

Gail K. Johnson, Johnson & Brennan, PLLC, Boulder, Colorado, for Defendant-Appellant.

Before **TYMKOVICH, BALDOCK,** and **HOLMES,** Circuit Judges.

**BALDOCK**, Circuit Judge.

*Oh what a tangled web we weave, when first we practice to deceive!*

Sir Walter Scott
Scottish Novelist (1771–1832)

By all appearances, Defendant Howard Kieffer had a successful nationwide criminal law practice based in Santa Ana, California. Defendant held himself out as Executive Director of Federal Defense Associates, and touted his services through websites, legal conferences, and professional contacts. As early as 1997, Defendant appeared as co-counsel of record in United States v. Olsen, 1997 WL 67730 (9th Cir. 1997) (unpublished). Over the next few years, Defendant gained admission to a slew of federal trial and appellate courts around the country, where he appeared on behalf of numerous criminal defendants. All the while, Defendant had a secret. He is not and never has been an attorney. He never went to law school, never sat for a bar exam, and never received a license to practice law.

Defendant no longer has a secret. In 2009, a jury in the District of North Dakota convicted Defendant of mail fraud, in violation of 18 U.S.C. § 1341, and making false statements, in violation of 18 U.S.C. § 1001. The jury found Defendant gained admission to the District of North Dakota by submitting a materially false application to the court. He then relied on that admission to gain admission to the District of Minnesota, District of Colorado, and Western District of Missouri. Once admitted in those districts, Defendant proceeded to appear on behalf of federal criminal defendants unaware of his true identity. The district court sentenced Defendant to 51 months imprisonment and ordered him to pay $152,750 in restitution to six victims of his scheme. The Eighth Circuit affirmed. United States v. Kieffer, 621 F.3d 825 (8th Cir. 2010).

2

Defendant's web of deception continued to unravel in 2010 when a jury in the District of Colorado also convicted him of making false statements in violation of § 1001, in addition to wire fraud, in violation of 18 U.S.C. § 1343, and contempt of court, in violation of 18 U.S.C. § 401. As to the false statements count, the jury found that to gain admission to the District of Colorado, Defendant fraudulently represented to the court clerk's office that he was licensed to practice law in the District of Columbia. As to the wire fraud count, the jury found Defendant used a website, www.boplaw.com, to promote his unauthorized practice of law and bilk a criminal defendant's brother out of several thousand dollars. Lastly, as to the contempt count, the jury found Defendant jeopardized the administration of justice by lying to the clerk's office and purporting to represent that criminal defendant before the district court. The district court sentenced Defendant to 57 months imprisonment to run consecutively to the 51 month sentence previously imposed on him in the District of North Dakota. The court further ordered him to pay restitution in the amount of $152,019 to seven victims of his scheme unaccounted for in North Dakota, and directed him as a special condition of supervised release to obtain the probation office's preapproval of any proposed employment or business ventures. Defendant now appeals his most recent convictions and sentence. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2). For reasons to follow, we affirm the district court's judgment of conviction, but vacate its judgment of sentence on the wire fraud and false statements counts, and remand for resentencing.

I.

Defendant presents three challenges to his convictions in the District of Colorado. Each is based on his Sixth Amendment right to have the Government prove, and a jury find, all elements of the charged crimes beyond a reasonable doubt. First, Defendant asserts he is entitled to a judgment of acquittal on the wire fraud count because the Government failed to prove all of § 1343's necessary elements. Specifically, Defendant argues the Government's evidence failed to establish that his internet communications (1) traveled in interstate commerce or (2) were used for the purpose of executing a scheme to defraud. Second, Defendant asserts he is entitled to a new trial on all counts because the district court's "reasonable doubt" instruction erroneously defined that term and shifted the burden of proof to him.

Defendant further presents five challenges to his sentence, three of which bear directly upon the district court's application of the Sentencing Guidelines. First, Defendant asserts the district court improperly included his sentence in the District of North Dakota in its criminal history calculation under U.S.S.G. § 4A1.1, rather than the offense underlying that sentence in its consideration of relevant conduct under § 1B1.3. Second, Defendant contends the district court's failure to consider his offense in the District of North Dakota as relevant conduct enabled it to impose a sentence consecutive to the sentence imposed on him in North Dakota, contrary to § 5G1.3. Third, Defendant asserts the court failed on the evidence presented to make a reasonable estimate of loss amounts under § 2B1.1 in its calculation of his offense

level. Defendant also challenges the district court's restitution order based on the Government's failure to prove actual loss amounts to identified victims of his scheme by a preponderance of the evidence, as required by 18 U.S.C. § 3664(e). Lastly, Defendant challenges, as contrary to 18 U.S.C. §§ 3563(b)(5), the court's imposition of the special condition of supervised release that he obtain the probation office's approval before undertaking any occupational endeavor.

We present our discussion of Defendant's numerous legal challenges in two parts and various subparts. In Part II, we address Defendant's three challenges to his convictions. First, we set forth in a light most favorable to the Government the trial evidence relevant to Defendant's § 1343 conviction. See United States v. Bass, 661 F.3d 1299, 1307 (10th Cir. 2011). We then analyze Defendant's sufficiency challenges to that conviction based on the evidence and the applicable law. We conclude Part II by analyzing Defendant's challenge to the district court's reasonable doubt instruction. In Part III, we address Defendant's five challenges to his sentence. We begin by summarizing the presentence proceedings through the final sentencing hearing. Therein, we include additional facts which the Government did not present at trial, but which the district court considered in reaching its sentencing decision. We then analyze Defendant's sentencing challenges, as well as the Government's assertion of harmless error, based on the record evidence and applicable sentencing statutes and guidelines.

5

## II.

We begin our recitation of the evidence with the trial testimony of Natalie Sterling. Sterling is the custodian of records for both Network Solutions and Name Secure, a subsidiary of Network Solutions. Network Solutions and Name Secure are domain name registrars headquartered in Herndon, Virginia. In addition to being a registrar, parent company Network Solutions provides hosting services for websites. On direct examination, Sterling made no distinction between Network Solutions and Name Secure. On cross-examination, Sterling clarified that she was the custodian of records for both companies. She explained (1) Name Secure was "a separate functioning registrar from Network Solutions," (2) anyone who wanted to register a domain name could "go through" either Name Secure or Network Solutions, and (3) Network Solutions, "in addition to being a registrar, provides hosting services." Rec. vol. 3, at 219–22.

Sterling explained that a domain name is necessary to create a website. Once a purchaser registers a domain name with either Network Solutions or Name Secure, that purchaser may create an internet website associated with the domain name. As long as that registration is maintained, the domain name is exclusive to the registrant.

> Q. Once a registrant registers their web site name with your company, is that web site available on the internet?
> A. It is.
> Q. And how does that website name get broadcast over the internet, for lack of a better term?
> A. When a customer purchases the domain name, they would associate files with that domain name and then those files would

6

be available on the internet.

Q. Do you guys operate servers or anything like that?
A. We do.
Q. And where are those servers located?
A. Sterling, Virginia.
Q. And what do those servers function to do? What is their job?
A. They process and store data.
Q. Okay. When you say "process and store data," do they help distribute the web site information over the internet?
A. Yes.
Q. Okay. So anyone who would register a domain name with your company, would that site be viewable anywhere in the United States?
A. Yes.

Rec. vol. 3, at 199–200. Based on records maintained in a customer service database by Network Solutions, labeled Plaintiff's Exhibit 9, Sterling testified that on May 13, 2004, one Howard Kieffer, P.O. Box 206, Santa Ana, California, 92702, registered the domain name boplaw.com with Name Secure. Kieffer reported his email address as hkieffer@dcounsel.com. That registration, which Network Solutions' records indicated was last updated in September 2006, expired on May 13, 2010.

FBI Special Agent David Carr testified that in April 2010 he utilized a website known as archive.org to review boplaw.com. Archive.org allows one to access screen shots of web pages that no longer actively appear on the internet. In other words, archive.org "endeavor[s] to go out and capture what's on the Internet" at a particular point in time. Rec. vol. 3, at 459. The contents of the boplaw.com website, labeled Plaintiff's Exhibit 8, and, according to Agent Carr, last updated in June 2006, promoted Federal Defense Associates (FDA). In bold lettering, the website's "Home" page described FDA's "Practice [as] Limited to Application of

Federal Sentencing Guidelines, Post-Conviction and Bureau of Prisons Issues." The homepage prominently displayed the member symbol of the National Association of Criminal Defense Lawyers. The "Firm Profile" page described "Mr. Kieffer," the only individual whose name appeared anywhere on the website, as having "served on the faculty of programs sponsored by," among others, the "National Association of Criminal Defense Lawyers (NACDL), . . . and the Federal Bureau of Prisons (BOP)." The "Mission" page stated FDA "is committed to providing defense counsel and their clients with specialized, creative and tenacious criminal defense, post conviction representation and Bureau of Prison advocacy." The "Attorneys Only" page described "How It Works:" "Following initial consultation, the Firm reviews relevant court records . . . and client data. The attorneys confer to develop sentencing strategies. . . . Unlike the 'paralegal firm' providing 'consulting services,' we are bound by the Rules of Professional Responsibility." Finally, on the "Contact Us" page, the website listed the following contact information:

> Federal Defense Associates
> Howard O. Kieffer
> Executive Director
> 34 Civic Center Plaza
> P.O. Box 206
> Santa Ana, California 92702
>
> Telephone:  714-836-6031
> Facsimile:   714-543-5890
>
> email: hkieffer@dcounsel.com

Government witness Gail Shifman, a criminal defense attorney practicing in San Francisco, testified she met Defendant through NACDL.  Shifman spoke with Defendant at NACDL conferences on multiple occasions.  Shifman stated Defendant "had a lot of knowledge about BOP issues.  He ran—he told me he ran a website.  And I had been on [Defendant's] list serve, I think it was, or e-mail listing for bop.gov and bopwatch maybe."  Rec. vol. 3, at 112.  Shifman stated Defendant "held himself out to be a lawyer."  Id. at 114.  In September 2006, both Shifman and Defendant attended a NACDL conference in Washington, D.C.  During the conference, another attendee informed Shifman that Defendant was not a lawyer.  Shifman promptly sent Defendant an email at hkieffer@dcounsel.com, labeled Plaintiff's Exhibit 16, asking him to clarify his status because "if it is correct that you are not a licensed attorney, then you've directly lied to me on more than one occasion."  Defendant responded to Shifman via return email, a part of Plaintiff's Exhibit 16.  Among other things, Defendant wrote:

> In short, I am "licensed"—if that is the operative term (and I am not sure that it is) in no state, but I have been admitted (for various purposes) or specially appeared (in accord with local rules) in certain (federal) jurisdictions.
>
> I went to Antioch Law School—and graduated.

Defendant's return email to Shifman concluded:

- Howard O. Kieffer
- Federal Defense Associates
- Santa Ana, California
- 714-836-6031 x 250

• www.boplaw.com
• hkieffer@dcounsel.com

Shifman immediately contacted NACDL's executive committee. Shortly thereafter, she contacted the California State Bar and the FBI.

This was not the first time the FBI received a complaint about Defendant's legal escapades. Agent Dominic Anselmo testified that in 2004, the FBI received a complaint regarding Defendant's unauthorized practice of law. Apparently, that complaint stemmed from Defendant's involvement with an illegal alien convicted of possessing a firearm. Anselmo phoned Defendant regarding the complaint. According to Anselmo's report, Defendant "acknowledged that he is not an attorney" and was "aware that it is illegal to represent to . . . the courts that you are an attorney when in fact you are not." Rec. vol. 3, at 326. Defendant "explained that he [was] only providing complainant administrative assistance while complainant was serving his sentence." Id. at 326–27. The FBI phoned Defendant a second time in late June or early July 2007, again on a report, perhaps Shifman's, that Defendant was engaged in the unauthorized practice of law. This time Agent Carr posed as an individual looking for an attorney to assist his imprisoned cousin. In a recording labeled Plaintiff's Exhibit 17, Defendant told Carr he had been practicing law in federal court for twenty-five years. Defendant also told Carr he had a website and a listserv. Defendant described his work to Carr as "sentencing and after. I'm always the last lawyer hired, I'm always hired too late no matter how early that is."

10

Stephen Bergman testified that in June 2007 he viewed boplaw.com on a computer from his residence in Tennessee. Bergman stated Plaintiff's Exhibit 8 reflected the content of that website. When asked if anything in Exhibit 8 looked familiar, Bergman responded: "Yes, I recall seeing this on the Internet." Rec. vol. 3, at 251. After viewing the website and speaking with Defendant over the phone, Bergman met Defendant in Santa Ana, California, on June 26, 2007. Bergman tendered Defendant $10,000 to defend his sister, Gwen Bergman, against criminal charges filed in the District of Colorado after she allegedly paid an undercover "hit man" $30,000 to murder her ex-husband. Defendant gave Bergman a business card labeled Plaintiff's Exhibit 11. That card named Howard O. Kieffer as Executive Director of FDA. The card listed, among other things, a website—www.boplaw. com—and email address—hkieffer@ dcounsel.com. Bergman testified that because his sister was "being treated for a mental condition" in a federal prison, he was "looking for an attorney [who] specialized in [BOP] issues." Rec. vol. 3, at 248. When asked what led him to think Defendant was an attorney, Bergman responded: "I read certain things on—not just that website, but on another website where [Defendant] had given other attorneys advice about [BOP] issues, so he seemed to be somewhat of an expert . . . ." Id. at 250.

Before Defendant could enter his court appearance for Bergman's sister, however, he needed to be admitted to practice in the District of Colorado. As attorney services coordinator in the federal district court clerk's office, Mark

11

Fredrickson processes applications for admission to the District of Colorado. Fredrickson testified that according to both the district's civil and criminal local rules, an applicant for admission must be "licensed by the highest court of a state, federal territory, or the District of Columbia, where a written examination was required for admission." Rec. vol. 3, at 177. Fredrickson stated that in October 2007, he was reviewing Defendant's application, labeled Plaintiff's Exhibit 1, when he noticed Defendant had failed to indicate, as requested on the application form, where he received his license to practice law. Instead, Defendant typed "N/A; See Below" in the space provided. Below, where asked to indicate the courts in which he had been admitted to practice, Defendant listed three federal courts, namely, the Fourth and Ninth Circuit Courts of Appeals and the District of North Dakota. Fredrickson phoned Defendant at the number listed on the application to inquire. Defendant informed Fredrickson "he was licensed in the District of Columbia." Rec. vol. 3, at 175. As a result, Fredrickson wrote "called, licensed to practice in D.C." on a sticky note, part of Plaintiff's Exhibit 1, and placed it on Defendant's application. Fredrickson testified Defendant was admitted to the District of Colorado on October 1, 2007, the date of his application's file stamp.

On October 9, 2007, Defendant entered his appearance for Gwen Bergman, labeled Plaintiff's Exhibit 4, in United States v. Bergman No. 04-CR-180-WDM (D. Colo., filed April 30, 2004). A few days later, Defendant commenced his in court representation of Ms. Bergman, appearing on her behalf at a competency

12

hearing. Following a bench trial in May 2008, at which Defendant and co-counsel represented Ms. Bergman, the district court found her guilty of solicitation to commit murder and conspiracy to commit murder for hire. See United States v. Bergman, 599 F.3d 1142, 1145–46 (10th Cir. 2010) (tracing Defendant's involvement in Ms. Bergman's prosecution). By June 7, 2008, Stephen Bergman had paid Defendant a total of $65,750 to represent his sister. To pay Defendant's escalating fee, Bergman testified he took out a second mortgage on his home and his mother sold stock.

Prior to Defendant's entry of appearance, Edward Pluss, an attorney with the Federal Public Defender's office in Denver, Colorado, represented Ms. Bergman. Pluss testified that when he received notice of Defendant's entry of appearance, he accessed the internet and "looked up to see who Mr. Kieffer was." Rec. vol. 3, at 142. Pluss recalled viewing "the website for Mr. Kieffer's law firm on the internet." Id. Pluss stated that although "[i]t was a long time ago," the website he had viewed "look[ed] similar" to the contents of the boplaw.com website introduced through Agent Carr and labeled Plaintiff's Exhibit 8. Id. When asked what led him to believe Defendant was an attorney, Pluss responded: "He entered an appearance to represent Ms. Bergman. . . . I learned he was involved in the NACDL as an expert, involving post-sentencing and the BOP issues. His website." Id. at 146. Pluss subsequently withdrew as counsel for Ms. Bergman.

Shortly after Ms. Bergman's trial, Defendant's web of deception began to crumble. On June 12, 2008, Defendant received a show cause order from the District

13

of North Dakota inquiring into the veracity of statements he made on his application for admission to that court. See In re Admission of Howard Kieffer, No. 08-MC-7-DLH, Order to Show Cause (D.N.D., filed June 5, 2008). Bergman testified he received a phone call from a reporter with the Denver Post around the same time. That phone call led Bergman to believe Defendant might not be an attorney. Bergman informed Defendant "there appears to be a problem" and "[t]hey're saying that you're not an attorney." Rec. vol. 3, at 263. Defendant referred to the matter as "just a misunderstanding." Id. On July 2, 2008, Defendant, now represented by counsel, submitted his response, labeled Plaintiff's Exhibit 14, to the District of North Dakota's show cause order. Therein, Defendant admitted he is "not a member" of the bar of any state or other jurisdiction and "holds no degree" from Antioch Law School. Rec. vol 3, at 356. Consistent with Defendant's response, a search of the bar records for the District of Columbia uncovered "[n]o record for Howard O. Kieffer." Id. at 276. Similarly, a search of the Antioch College of Law's records uncovered nary a trace that Defendant was "ever a student" there.[1] Id. at 289–90. On July 4, 2008, the District of Colorado suspended Defendant from the practice of law. In February 2010, a grand jury in the District of Colorado returned

[1] Antioch College of Law in Washington D.C. opened in 1972 and closed in 1988. Antioch University in Yellow Springs, Ohio, maintains the law school's records. Sometime in 2006, Defendant requested a copy of "his diploma" from Antioch University's transcript clerk. This, of course, set the records department on a wild goose chase searching for something that did not exist. See Rec. vol. 3, at 286–90.

14

a superceding indictment charging Defendant in Count I with wire fraud in violation of 18 U.S.C. § 1343, in Count II with making false statements in violation of 18 U.S.C. § 1001, and in Count III with contempt of court in violation of 18 U.S.C. § 401. Two months later, a petit jury found Defendant guilty on all counts.

A.

Defendant first challenges the sufficiency of the evidence relating to his wire fraud conviction under Count I of the superceding indictment. The federal wire fraud statute, 18 U.S.C. § 1343, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, [or] radio . . . communication in interstate . . . commerce, any writings, signs, signals, [or] pictures, . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

By its plain terms, § 1343 required the Government to prove, among other things, that Defendant (1) used interstate wire or radio (wireless) communications (2) for the purpose of executing a scheme to defraud. See United States v. Cooper, 654 F.3d 1104, 1116 (10th Cir. 2011). According to Defendant, the Government proved neither of these elements, and thus his wire fraud conviction cannot stand.

We well know that "no person shall be made to suffer the onus of a criminal conviction except upon . . . evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316 (1979). But this does not mean the evidence need

15

convince a trier of fact beyond *all* doubt.  Rather, the evidence, both direct and circumstantial, considered in a light most favorable to the Government, "need only reasonably support the jury's finding that the defendant is guilty of the offense beyond a reasonable doubt."  United States v. Kaufman, 546 F.3d 1242, 1263 (10th Cir. 2008).  The evidence, together with the reasonable inferences to be drawn therefrom, "must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt."  United States v. Kitchell, 653 F.3d 1206, 1228 (10th Cir. 2011).  Mindful of the governing standard, we proceed to review Defendant's sufficiency challenges de novo.[2]

---

[2]  The Government urges us to review Defendant's sufficiency challenges only for plain error because Defendant failed to raise in the district court the particular grounds for relief he now presses upon us.  To be sure, Defendant, pursuant to Fed. R. Crim. P. 29(a), moved for a judgment of acquittal on Count I at the close of the Government's case on grounds different than those he now proffers.  And, as a general rule, when a defendant moves for a Rule 29 judgment of acquittal in the district court on specified grounds, those grounds not specified are forfeited.  See United States v. Goode, 483 F.3d 676, 680–81 (10th Cir. 2007).  But here, Defendant sought to renew his motion after the close of all the evidence consistent with Rule 29(a), only to be cut off by the district court:

| | |
|---|---|
| Court: | If there is nothing further, we'll take a ten-minute break. |
| Counsel: | I move for a judgment of acquittal based on the – |
| Court: | I always forget, I'm sorry.  Based on the same reason for denying the Rule 29, I deny that motion. |

Rec. vol. 3, at 461.  Through no apparent fault of Defendant, we cannot be certain of the unspecified grounds on which he planned to base his renewed motion for judgment of acquittal.  We therefore provide Defendant the benefit of de novo review, while encouraging the district court to permit, within reason, a defendant to make the record necessary to preserve possible error and ensure meaningful review.

16

1.

The sole legal basis on which Defendant argues the Government failed to establish the interstate nature of his internet communications is United States v. Schaefer, 501 F.3d 1197 (10th Cir. 2007), superceded by Effective Child Pornography Prosecution Act of 2007, Pub. L. No. 110-358 (Oct. 8, 2008), and overruled in part by United States v. Sturm, 672 F.3d 891 (10th Cir. 2012) (en banc). We need not discuss the particulars of that war-torn decision here. Suffice to say Schaefer still stands for the proposition that one individual's use of the internet, "standing alone," is insufficient to establish that a web transmission "traveled across state lines in interstate commerce." Schaefer, 501 F.3d at 1200–01; but see, e.g., United States v. Lewis, 554 F.3d 208, 214–16 (1st Cir. 2009) (holding one's use of the internet, "standing alone," is enough to satisfy a penal statute's "in interstate . . . commerce" element); United States v. MacEwan, 445 F.3d 237, 244 (3d Cir. 2006) (same).

Like the statute at issue in Schaefer, the federal wire fraud statute requires a transmission "in interstate . . . commerce." 18 U.S.C. § 1343. In Schaefer, we recognized that § 1343's "'in commerce' terminology has been repeatedly held to require that communications actually cross state lines to support a conviction." Schaefer, 501 F.3d at 1202; see, e.g., Smith v. Ayres, 845 F.2d 1360, 1366 (5th Cir. 1988) (Higginbotham, J.) ("As several courts have recognized, [§ 1343] requires that the wire communication cross state lines."). In his opening brief, Defendant says the

17

Government failed to carry its burden because it did not "present *any* evidence of any interstate movement of a wire transmission posting a website advertising [Defendant's] legal services on the internet." Considering, as we must, the evidence in a light most favorable to the Government, together with the reasonable inferences to be drawn therefrom, we disagree: A jury could view the Government's evidence as establishing the required interstate nexus.

We begin with some facts readily discernible from the record. First, at all relevant times, Defendant was in control of the content of an internet website with the domain name boplaw.com.[3] Second, Defendant registered the domain

---

[3] At this point, we need address Defendant's suggestion, made within the context of his sufficiency challenges, that the district court abused its discretion by admitting Plaintiff's Exhibit 8 into evidence because the Government failed to properly authenticate it. Exhibit 8, recall, portrays the screen shots of boplaw. com from the relevant time period. Detective Carr testified he retrieved those shots from archive.org. shortly before trial. Under Fed. R. Evid. 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence *sufficient to support a finding* that the item is what the proponent claims it is." (emphasis added). The proponent can authenticate such item in various ways, including by "[t]he appearance, contents, [or] substance, . . . of the item, taken together with all the circumstances." Id. R. 901(b)(4). The district court need only "assess[] whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009). "The factual determination of whether the evidence is that which the proponent claims is ultimately reserved for the jury." Id. In this case, the district court did not abuse its discretion in ruling that Defendant's objection to Exhibit 8 went to its weight rather than its admissibility. Prior to Exhibit 8's admission, Natalie Sterling testified that (1) a domain name remains under the registrant's exclusive control prior to the registration's expiration; (2) Defendant registered the domain name boplaw.com in May 2004; and (3) the registration did not expire until May 2010. Unsurprisingly then, Detective Carr characterized the screen shots obtained from boplaw.com through archive.org as

(continued...)

18

name boplaw.com with Name Secure, a subsidiary of Network Solutions. Third, by definition, Network Solutions, as the parent company, owned and controlled Name Secure. See Webster's Third New Int'l Dictionary 2279 (1981) (defining "subsidiary" as "belonging to or controlled by another"). Fourth, Network Solutions operated host servers in Virginia that permitted a domain name registrant's website to be viewed on the internet once the registrant associated files with, *i.e.*, uploaded content under, the domain name. Fifth, Stephen Bergman and Edward Pluss accessed boplaw.com from computers in Tennessee and Colorado, respectively.

At this point, a jury might reasonably infer that because Bergman and Pluss accessed the content of boplaw.com from computers in different states, Defendant caused that content to be transmitted across state lines. The presence of end users in different states, coupled with the very character of the internet, render this inference permissible even absent evidence that only one host server delivered web content in these two states. Let us explain. Suppose local host servers in Tennessee and Colorado hosted the content of Defendant's website. Further suppose Bergman and Pluss accessed boplaw.com through those local servers. Unknown for the

---

[3](...continued)
describing and promoting the "Practice" of FDA. Those same screen shots identified Defendant as FDA's "Executive Director." Additionally, both Stephen Bergman and Edward Pluss later testified that the contents of Exhibit 8 appeared similar to what they viewed on the website boplaw.com in 2007. Therefore, "[t]he appearance, contents, [and] substance . . . of the item, taken together with all the circumstances" were "sufficient to support a finding" that Exhibit 8 accurately portrayed Defendant's website boplaw.com as it existed during the relevant time period.

moment is the whereabouts of an interstate transmission. But let us back up. Before *both* Bergman *and* Pluss could access boplaw.com through those local servers, two preconditions had to be met. First, Defendant had to upload the content of boplaw.com to an origin server in some state, maybe Tennessee, maybe Colorado, or perhaps Virginia. Where does not matter because end users in different states are involved. Second, that origin server had to transmit the uploaded content across state lines to the local host server in at least one of the two states involved, *i.e.*, either the server Bergman's computer accessed in Tennessee (this assumes the origin server was located in Colorado), or the server Pluss' computer accessed in Colorado (this assumes the origin server was located in Tennessee), or both (this assumes the origin server was located in a third state). See Akami Tech., Inc. v. Cable & Wireless Internet Serv., Inc., 344 F.3d 1186, 1189 (Fed. Cir. 2003) (describing "caching," "mirroring," and "redirection" as innovations designed to alleviate congestion in an origin server).[4] The transmission from the origin server located in

---

[4] The Federal Circuit has explained the underlying process in understandable terms. First, the user's personal computer sends a web page request to the "host server, or origin server." Akami Tech., 344 F.3d at 1189. An origin server is a computer that in the early stages of the internet received all web page requests and was responsible for responding to such requests. "[I]n response to a request from a user, the origin server would provide the web page to the user's browser. Internet congestion problems quickly surfaced in this system when numerous requests for the same web page were received by the origin server at the same time." Id. As Akami Tech. describes, computer specialists addressed the problem by developing a system essentially consisting of multiple host servers that in various ways draw web content from the origin server and deliver it to the end user.

one state to a host server located in another state—a transmission link in a communication chain necessary to deliver boplaw.com's content to Bergman's computer in Tennessee, or Pluss' computer in Colorado, or both—is sufficient in this case to satisfy § 1343's "in interstate . . . commerce" requirement.[5] See United States v. Mullins, 613 F.3d 1273, 1281 (10th Cir. 2010) ("The wire fraud statute doesn't require that a defendant be able to anticipate every technical detail of a wire transmission, before []he may be held liable for causing it. It's enough if []he 'set forces in motion which foreseeably would involve' use of the wires.").

Accordingly, we have no quarrel with the narrow proposition for which Schaefer still stands, namely that one individual's use of the internet, "standing alone," does not establish an interstate transmission. See United States v. Vigil, 523 F.3d 1258, 1266 (10th Cir. 2008) (recognizing the Government's "only evidence regarding interstate commerce" in Schaefer was defendant's use of the internet). This is because the origin and host servers, whether one and the same or separate, *might* be located in the same state as the computer used to access the website. But because a website's origin server is located in only one state, that proposition

---

[5] Of course, one might suppose Defendant traveled from Santa Ana, California and separately uploaded boplaw.com's content to two different origin servers, one in Tennessee and one in Colorado. One might also suppose the moon is made of green cheese. (If Defendant had uploaded his web content from California to an origin server outside that state, this too might have provided the required interstate transmission). Yet evidence sufficient to sustain a conviction "need not conclusively exclude every other . . . hypothesis;" nor need such evidence "negate all possibilities except guilt." Kitchell, 653 F.3d at 1228.

has *no* application in cases such as this where computers in multiple states access the same website. To arrive on a host server in another state (or for that matter on an end user's computer where no local host server is present), the content of the website contained on the origin server must transmit across state lines.

> This case, then, is the 'typical' case where 'the evidence of the interstate element can be gleaned from the record' evidence, and not a case where the [G]overnment relies exclusively on an assumption that materials downloaded from the Internet [by a single user in a single state] traveled in interstate commerce.

United States v. Swenson, 335 Fed. Appx. 751, 753–54 (10th Cir. 2009) (unpublished) (internal brackets and ellipses omitted) (quoting Schaefer, 501 F.3d at 1208 (Tymkovich, J., concurring)).

2.

Assuming an interstate transmission sufficient to satisfy § 1343, Defendant contends in the alternative that the Government failed to prove such transmission was made for the "purpose of executing [a] scheme" to defraud. To support his alternative claim, Defendant relies largely on our statement in United States v. Redcorn, 528 F.3d 727, 738 (10th Cir. 2008), that "[t]o meet § 1343's 'purpose' requirement, a wire transmission must be part of the execution of the scheme as conceived by the perpetrator *at the time*." (emphasis added) (internal quotations omitted). Defendant states in his opening brief that even assuming he conceived of a scheme to defraud, "the [G]overnment failed to present evidence sufficient to prove beyond a reasonable doubt that any wire transmission caused by [Defendant] in

22

connection with posting a website advertising his legal services was part of the execution of such a scheme as conceived by [Defendant] *at the time*." (emphasis added). Again, we cannot agree with Defendant's assessment of the evidence.

In Redcorn, we held the Government failed to prove defendants' "four charged transfers, from their private bank accounts in Oklahoma to their out-of-state investment accounts, were 'for the purpose of executing [a] scheme or artifice' to 'defraud.'" Redcorn, 528 F.3d at 738 (quoting 18 U.S.C. § 1343). We reasoned that "[o]nce the defendants deposited the funds into their personal bank accounts, they had accomplished their crime and the funds were available for their personal use. That they chose to transfer part of their stolen money to their broker in Florida . . . [was] purely incidental to the fraud." Id. at 739. Unlike the scheme in Redcorn, which achieved its objective and came to fruition prior to any interstate transmission, Defendant's fraudulent scheme was ongoing and came to an abrupt halt only upon legal compulsion. The Government does not rely on any wire or radio transmission occurring *after* the fact, that is, after Defendant got caught. So Defendant must be arguing the Government's evidence did not sufficiently negate the possibility that the interstate transmission occurred *before* he devised a scheme to engage in the unauthorized practice of law and defraud unknowing victims like the Bergmans. See United States v. Gallant, 537 F.3d 1202, 1229 (10th Cir. 2008) (reversing defendants' § 1343 convictions where the wire transmissions occurred before defendants became participants in a fraudulent scheme).

23

The evidence indicated Defendant registered the domain name boplaw.com in May 2004 and last updated the website's content in June 2006. Using terms such as "attorneys," "firm," "practice," "defense," "representation," and "advocacy," and listing his email address as hkieffer@dcounsel.com, Defendant undoubtedly designed the content of his website to give the impression that he was a criminal defense attorney authorized to engage in the practice of law. A jury could readily find that by the time Defendant uploaded his final revisions to boplaw.com in June 2006, the website was an integral part of his scheme to defraud unwitting patrons and engage in the unauthorized practice of law. This is illustrated by Defendant's promotion of his website after June 2006 by way of mouth, business card, and correspondence. For instance, recall that the closing of Defendant's return email to Gail Shifman in September 2006 referenced boplaw.com. The business card Defendant gave Stephen Bergman, Gwen Bergman's brother, in June 2007, likewise referenced boplaw.com. Thinking Agent Carr to be a dupe, Defendant mentioned his "website" to him during their phone conversation in late June or early July 2007. Both Bergman and Edward Pluss, Gwen Bergman's court-appointed defender who withdrew upon Defendant's entry of appearance, testified that the content of boplaw.com led them to believe Defendant was an attorney authorized to practice law.

As we learned in the preceding subpart, at least one interstate transmission was an indispensable part of the communication strand necessary to provide both Bergman and Pluss access to boplaw.com in June and October 2007, respectively.

24

As we further learned, that transmission occurred after Defendant uploaded the deceptive website's content to an origin server, or, in other words, after Defendant instigated his fraudulent scheme. Because a jury could readily find this interstate transmission *at the time* was "incident to the accomplishment of an essential part of the scheme,"—namely, Defendant duping Bergman and Pluss so that for a substantial fee he could "represent" the former's sister on criminal charges in the District of Colorado—such transmission "is considered to be for the purpose of furthering a scheme to defraud" within the meaning of § 1343. Redcorn, 528 F.3d at 738 (internal quotations omitted).

B.

Defendant next challenges his three convictions by complaining that Jury Instruction #3, the district court's reasonable doubt instruction, deprived him of his Sixth Amendment right to a fair trial. That instruction read in part:

> Although the Government's burden of proof is a strict and heavy burden, proof beyond a reasonable doubt does not mean proof beyond all possible doubt. There are very few things in this world that we know with absolute certainty. The test is one of reasonable doubt. A "reasonable doubt" is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Reasonable doubt may arise from the evidence, the lack of evidence, or the nature of the evidence. *It is the kind of **proof** that would make a reasonable person hesitate to act.* Proof beyond a reasonable doubt must, therefore, be proof which is so convincing that a reasonable person would not hesitate to rely and act upon it in making the most important decisions in his/her own life.

Rec. vol 1, at 101 (emphasis added). In his opening brief, Defendant says use of the word "proof" rather than "doubt" in the above italicized sentence resulted in

25

the court "misstat[ing] the definition of reasonable doubt by telling the jury that 'reasonable doubt' is a 'kind of proof,'" thus "wrongly suggest[ing] that [Defendant] had to prove something in order to establish a reasonable doubt." (internal brackets omitted). Because Defendant did not object to the instruction at trial, we consider the alleged error forfeited and subject only to plain error review under Fed. R. Crim. P. 52(b). "'A plain error that affects substantial rights may be considered even though it was not brought to the court's attention'" if such error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Puckett v. United States, 556 U.S 129, 135 (2009) (quoting Fed. R. Crim. P. 52(b)) (internal brackets and quotations omitted). Accordingly, "[p]lain error occurs when there is (1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Mendoza-Lopez, 669 F.3d 1148, 1151 (10th Cir. 2012) (internal quotations omitted).

Relying extensively on Sullivan v. Louisiana, 508 U.S. 275 (1993), Defendant seeks to skirt plain error analysis by asserting the district court's alleged error was "structural," that is to say, the instruction's purported "misstatement" necessarily prejudiced Defendant and rendered his trial fundamentally unfair from beginning to end. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991) (defining structural errors as those affecting "the framework within which the trial proceeds"). In Sullivan, the district court tendered a reasonable doubt instruction to the jury that equated

26

reasonable doubt with "grave uncertainty" and "substantial doubt." Sullivan, 508 U.S. at 277. Addressing an almost identical instruction in Cage v. Louisiana, 498 U.S. 39, 41 (1990) (per curiam), overruled in part by Estelle v. McGuire, 502 U.S. 62, 72 n.4 (1991), the Court earlier had opined that "the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." Sullivan held that because such an instruction denied defendant "the right to a jury verdict of guilt beyond a reasonable doubt," a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by harmless-error standards," had occurred, thus warranting reversal of defendant's conviction. Sullivan, 508 U.S. at 281.

Subsections (a) and (b) of Fed. R. Crim. P. 52 address harmless and plain error respectively. Harmless error, the sort of error Sullivan described, is a preserved "error . . . that does not affect substantial rights." Fed. R. Crim. P. 52(a). Rule 52(a) harmless error analysis and the third or "substantial rights" prong of Rule 52(b) plain error analysis "normally require[] the same kind of inquiry." United States v. Olano, 507 U.S. 725, 734 (1993). Because Sullivan tells us structural error defies harmless error analysis under subsection (a)'s "substantial rights" test, such error would seem to defy analysis under the third prong of subsection (b)'s plain error standard. Cf. Puckett, 556 U.S. at 140 (declining "to resolve whether 'structural' errors . . . automatically satisfy the third prong of the plain-error test"). But this in no sense suggests that structural error is per se reversible in the plain error context. A

27

defendant failing to object to structural error in the district court likely would still need to establish that an error was plain and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. See United States v. Rodriguez, 406 F.3d 1261, 1282–83 (11th Cir. 2005) (Tjoflat, J., dissenting from denial of reh'g en banc). We need not foment that matter further, however, because the district court's reasonable doubt instruction in this case constitutes neither structural nor even plain error. That instruction did not deny Defendant his right to have the Government prove, and a jury find, him guilty beyond a reasonable doubt.

We do not assess the district court's reasonable doubt instruction in "artificial isolation," but view it "in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146–47 (1973). "[T]he proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." Victor v. Nebraska, 511 U.S. 1, 6 (1994). Our lens focused, we summarily reject Defendant's argument that the instruction erroneously shifted the onus of proof to him, thereby relieving the Government of its burden to prove him guilty of the charged crimes. Under either plain or structural error analysis, "[f]irst, there must be an error or defect—some sort of 'deviation from a legal rule'—that has not been . . . affirmatively waived." Puckett, 556 U.S. at 135 (internal brackets omitted). Four instructions informed the jury that the burden of proof was on the Government. Another told the jury the burden never shifted from the Government. Two more instructions informed the jury Defendant was

28

presumed innocent of the charges.  See Cupp, 414 U.S. at 147.  The two paragraphs

of Instruction #3 immediately proceeding the paragraph at issue read:

> The Court instructs you that you must presume Defendant Howard O. Kieffer to be innocent of the crime(s) charged.  Thus, Defendant Kieffer, although accused of crimes in the Superceding Indictment, begins the trial with a "clean slate"—with no evidence against him. The law permits the jury to consider only legal evidence presented in court. . . .
>
> The Government has the burden of proving Defendant Kieffer guilty beyond a reasonable doubt.  Unless the Government proves, beyond a reasonable doubt, that Defendant Kieffer has committed each and every element of the offense(s) charged in the Superceding Indictment, you must find him not guilty of those offenses not proven.  This burden never shifts to Defendant Kieffer because the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness, producing any evidence, or even cross-examining the Government's witness.

Rec. vol. 1, at 101.

Because the instructions, considered in their entirety, properly placed the

burden of establishing Defendant's guilt on the Government, all that remains of his

objection is the claim that, like the erroneous instruction in Sullivan, Instruction #3

wrongly defined the extent of that burden.  The apposite portion of the instruction

began by explaining that "proof beyond a reasonable doubt" does not mean the

Government must prove Defendant guilty of the charges "beyond all possible doubt"

or "with absolute certainty."  Rec. vol. 1, at 101.  Rather, the instruction described

reasonable doubt as "doubt based upon reason and common sense" in light of "all the

evidence."  Id.  The instruction explained "[r]easonable doubt may arise from the

evidence, the lack of evidence, or the nature of the evidence." Id. Considered in context, a jury might plausibly read the preceding explanation's references to (1) the evidence presented, (2) the evidence not presented, and (3) the character of the evidence, as referring to the Government's proof. So read, the next sentence's description of reasonable doubt as a "kind of *proof* that would make a reasonable person hesitate to act," does not constitute a clear or obvious misstatement of law as required by the second prong of plain error analysis. (emphasis added).

To be plain, a "legal error must be clear or obvious, rather than subject to reasonable dispute." Puckett, 556 U.S. at 135. By definition, reasonable doubt in the criminal context denotes insufficient proof of guilt. So viewed, the instruction's concluding sentence logically follows from the preceding sentence's description of reasonable doubt as a "kind of proof." That sentence reads: "Proof *beyond* a reasonable doubt must, therefore, be proof which is so convincing that a reasonable person would *not* hesitate to rely and act upon it . . . ." Rec. vol. 1, at 101 (emphasis added). A description of "reasonable doubt" as resting on "proof that would make a reasonable person hesitate to act" is simply the converse of a description of *"beyond a reasonable doubt"* as "proof . . . so convincing that a reasonable person would not hesitate to . . . act." Id. "[T]hat is, if a reasonable doubt makes a reasonable person hesitate to act, proof beyond a reasonable doubt is proof upon which a reasonable person would not hesitate to act." United States v. Smith, 531 F.3d 1261, 1269 (10th Cir. 2008) (internal quotations omitted).

30

Perhaps Instruction #3 should have described reasonable doubt as a "kind of doubt" or "lack of proof," – rather than a "kind of proof," – that would make a reasonable person "hesitate to act." We have stated "the preferable 'reasonable doubt' instruction is one couched in terms of the *kind of doubt* that would make a person hesitate to act." United States v. Barrera-Gonzales, 952 F.2d 1269, 1271 (10th Cir. 1992) (emphasis added). But wording preferable to that the district court employed does not alone render the court's instruction so infirm as to constitute an error that is plain and affects Defendant's substantial rights, contrary to the Sixth Amendment. See Fed. R. Crim P. 52(b). Defendant was entitled to a fair trial, not a perfect one. We need not belabor the point. Suffice to say, any error, *if error*, in the district court's instruction labeling reasonable doubt as a "kind of proof that would make a reasonable person hesitate to act" shares no common features with the instructional errors in Sullivan that grossly misdefined reasonable doubt as "grave uncertainty" or "substantial doubt," and served to "vitiate[] *all* the jury's findings." Sullivan, 508 U.S. at 281. The alleged instructional error is not plain, let alone structural. Accordingly, we affirm Defendant's convictions in their entirety.

III.

Having upheld Defendant's convictions, we turn to his previously identified sentencing challenges – five in total. See, supra at 4–5. Given the tortuous nature of the process that culminated in Defendant's actual sentencing, some familiarity with the United States Sentencing Guidelines is assumed. Our point of departure is

the original Presentence Investigation Report (PSR). Using the 2009 version of the Guidelines, the PSR grouped Defendant's wire fraud and false statements convictions pursuant to U.S.S.G. § 3D1.2(d), because of the ongoing nature of Defendant's criminal objective, *i.e.*, to engage in the unauthorized practice of law at the expense of the Bergmans and others. Based on an adjusted offense level of 24 and a criminal history category II, the PSR set Defendant's advisory guideline sentencing range on the grouped convictions at 57 to 71 months imprisonment.[6]

According to the PSR, Defendant's offense level included a 14-level increase because his scheme involved twelve victims, including Stephen Bergman, suffering an aggregate loss of $324,769.[7] The PSR disregarded most of Defendant's criminal history, much of which involved fraudulent misconduct, due to the age of his prior convictions and/or his lack of imprisonment. Defendant's criminal history category

---

[6] The PSR placed Defendant's contempt conviction outside the group because the district court before which he appeared as Gwen Bergman's counsel suffered distinct harm as a result of that conduct. See U.S.S.G. § 3D1.2 (stating "[a]ll counts involving substantially the same harm shall be grouped together as a single Group"). The district court sentenced Defendant to 37 months imprisonment on that conviction to run concurrently with the 57 month sentence on his grouped convictions. On appeal, Defendant does not challenge the 37 month sentence on his contempt conviction.

[7] The PSR identified those 12 individuals and their losses as follows: Stephen Bergman ($65,750); Ken Henderson ($30,000); Natasha Caron ($25,000); Joel Wells ($37,000); Vernon Reed ($15,000); Donald Sturgis ($3,519); Edwin Stupka ($20,000); Dr. Victor Souaid ($32,000); Richard Lynn ($5,000); Michael Danton ($40,000); Wayne Milton ($36,500); and Mark Anthony Roberts ($15,000). As part of Defendant's sentencing in the District of North Dakota, that court accounted for the losses to Bergman (and his mother), Henderson, Caron, Wells, and Reed in both its calculation of Defendant's offense level and in its order of restitution.

II arose solely from his 1989 convictions for making multiple false tax refund claims against the Government in violation of 18 U.S.C. § 287. The original PSR recommended the district court impose a 60 month sentence on Defendant to run concurrently with the 51 month sentence he received in the District of North Dakota. The PSR further recommended the court order Defendant to pay a total of $152,019 to seven identified victims of his scheme unaccounted for in the District of North Dakota's restitution order. See, supra n.7. The PSR made no recommendation regarding a special condition of supervised release requiring Defendant to obtain the probation office's prior approval of employment or business ventures.

Defendant posed numerous objections to the original PSR. In addition to denying that any identified victim was entitled to restitution, Defendant objected on two pertinent grounds to the PSR's statement that he bilked twelve individuals out of $324,769 during the course of his scheme. Defendant argued the record contained "no evidence" to support the PSR's allegations. Rec. vol. 5, at 4. Defendant also argued that apart from Stephen Bergman, none of the identified victims "b[ore] any relationship to either the Bergman case or the District of Colorado." Rec. vol. 4, at 51. The Government responded to Defendant's second argument in particular. The Government noted that where convictions on two or more counts are grouped, the district court determines the specific offense characteristics affecting the calculation of a defendant's offense level under the "relevant conduct" provisions of U.S.S.G. § 1B1.3(a)(2), or, in other words, from all "acts and omissions . . . that were part of

33

the same course of conduct or common scheme or plan as the offense of conviction."

The probation office's first addendum to the PSR similarly responded:

> As noted in the Government's response to Defendant's objections, the Defendant used the same scheme in all of his relevant conduct, filed court pleadings as though he was an attorney, attended attorney trainings, and told a number of individuals that he was an attorney. The Probation Office stands by its position concerning relevant conduct in this case.

Rec. vol. 4, at 107. Included in this position was the original PSR's determination that Defendant's criminal misconduct accounted for in the District of North Dakota was part of his relevant conduct within the meaning of § 1B1.3(a)(2).

At a preliminary sentencing hearing, the district court expressed its intent to impose a non-guideline sentence on Defendant in the form of an upward variance. The court opined that U.S.S.G. § 5G1.3(b)(2), by way of § 1B1.3(a)(2), provided that any term of imprisonment imposed on Defendant should run concurrently to the sentence imposed on him in the District of North Dakota. But the court believed a 60 month sentence of imprisonment to run concurrently with Defendant's prior 51 month sentence was "not sufficient to achieve the statutory purposes of sentencing set forth at 18 [U.S.C. §] 3553(a)." Rec. vol. 3, at 518.

> [I]t is my finding that [Defendant's] criminal history score . . . under-represents the seriousness of [his] criminal history and the danger that he presents to the public based on [his] repeated pattern of taking advantage of others.
>
> In addition, although both the Government and [Defendant] refer to [U.S.S.G §] 5G1.3, in . . . recommending that I run the sentence that I impose concurrent with [Defendant's] North Dakota case, I find that

34

> guideline does not fit in [his] circumstances because that will result in a much lower sentence than [he] deserve[s].
>
> Therefore, I'm continuing this sentencing hearing. I am putting [Defendant] on notice that I intend to upward depart. . . . I would like some briefing on whether I am bound by [§] 5G1.3 . . . . [I]t is my position that I am not bound by that. It is a recommendation, and I don't feel that the [§ 3553(a) sentencing] factors are met in this case.

Id. at 521–22. Both sides acknowledged that although the 2009 Guidelines, including § 5G1.3, were advisory, the law required the district court to adhere to proper sentencing procedures in determining Defendant's applicable guideline range.

The probation office also responded to the district court in a third addendum to the original PSR. (The second addendum does not affect this appeal). The third addendum remarkably suggested the district court *not* consider as relevant conduct under § 1B1.3(a)(2) those victims and their losses the District of North Dakota had determined to be relevant conduct under the same provision. That encompassed the loss attributable to five cases including the Bergman case. See, supra n.7. The addendum suggested the court instead consider Defendant's sentence in the District of North Dakota as part of his criminal history pursuant to § 4A1.1. In this manner, the district court could sidestep § 5G1.3(b)(2) and still sentence Defendant within a guideline range of 57 to 71 months based on a revised adjusted offense level of 23 and a revised criminal history category III. The addendum explained that "should the court determine the . . . loss in the District of North Dakota is not relevant conduct, U.S.S.G. § 5G1.3(b) would no longer be applicable and the court maintains

35

the discretion to impose the sentence for the instant offense to run concurrent or consecutive to the North Dakota sentence." Rec. vol. 4, at 121. Apparently modifying his earlier position that none of the PSR's other identified victims bore any relationship to the Bergmans, Defendant objected to the third addendum:

> Curiously, the third addendum attempts to address a number of different issues that would arise if the North Dakota case is not regarded as relevant conduct herein. The Third Addendum is curious in this regard because it has never been suggested by either the Government or [Defendant] that the North Dakota case is not relevant conduct. Any such suggestion would fly in the face of the evidence as the North Dakota conduct was used to obtain admission to the United States District Court in Colorado. Indeed the Sentencing Guidelines make abundantly clear that the North Dakota case is relevant conduct and must be considered thusly.

Id. at 135.

Swayed by the third addendum's suggested approach, the district court at Defendant's final sentencing hearing (1) abandoned its previously stated intent to vary upward from the applicable guideline range based on § 3553(a)'s sentencing factors, (2) excluded from Defendant's relevant conduct the five cases considered as relevant conduct in the District of North Dakota, and (3) included Defendant's sentence in the District of North Dakota in his criminal history. At the hearing's outset, the court noted Defendant's "object[ion] to the inclusion of the 12 separate clients representing a loss of $324,769." Rec. vol. 3, at 532. The court "agree[d] that the inclusion of some of this information must be excluded in calculating the offense level." Id. at 532–33. The court then stated its revised intentions.

36

The district court began by observing that according to PACER, the Public Access to Court Electronic Records website, Defendant had appeared of record in 18 federal criminal cases over the course of his scheme. To calculate Defendant's offense level, the court would exclude the five cases accounted for in the District of North Dakota. Next, the court would take judicial notice of 13 cases around the country in which Defendant had appeared because, in its words, Defendant "used the same scheme in all of these cases." Rec. vol. 3, at 537. As to the amount of loss to the victims in those 13 cases, the court would find the PSR "establishe[d] by a preponderance of the evidence that the loss was at least $152,019." Id. The district court obviously based that figure on the aggregate loss to the seven victims the original PSR specifically identified as entitled to restitution. Based on these and other proposed findings that differed somewhat from the proposed findings proffered in the PSR's third addendum, the court stated it intended to set Defendant's adjusted offense level at 23, one level lower than the original PSR. To arrive at Defendant's criminal history category III, one category higher than the original PSR, the court stated it would include in his criminal history "all matters that were included as relevant conduct in the North Dakota case." Id. at 539.

All this machination resulted in the same 57 to 71 month advisory guideline range as the original PSR, with one important exception. Because the district court did not intend to consider the victims and the loss amounts used to determine Defendant's offense level in the District of North Dakota as conduct relevant to his

convictions in the District of Colorado within the meaning of § 1B1.3(a)(2), § 5G1.3(b)(2)'s concurrent sentencing provision necessarily would not apply. And this, the court reasoned, would permit it to impose a sentence on Defendant that ran consecutive to the sentence imposed on him in the District of North Dakota: "5G1.3 does not apply because in calculating the offense level in this case, I have not included either the crime for which [D]efendant was convicted in North Dakota, nor any of the relevant conduct included by the sentencing judge in the North Dakota case when he computed the [D]efendant's sentence . . . ." Rec. vol. 3, at 565–66.

At this point, the court provided the parties the opportunity to comment on its revised intentions. Defendant renewed both his prior factual and legal objections, focusing on the lack of evidence before the court:

> [T]he real big argument . . . is the . . . Government has the burden to prove loss by a preponderance. And we have made a specific objection to the loss amounts in the PS[R]. There has been no proof as to those loss amounts. Therefore, we believe the loss amount is zero. At most it is $65,750 [the amount of loss to the Bergmans].

Rec. vol. 3, at 544. In response, the Government called Special Agent Todd Wilcox to the stand. Agent Wilcox testified he received a report from inmate Richard Lynn. Lynn reported he paid Defendant $5,000 to represent him in a prison disciplinary appeal. The court asked the Government if it was "going to offer any evidence of the other amounts outstanding." Id. at 554. The Government said no, but argued the record established Defendant on average had charged in excess of ten victims $10,000 and $20,000 each: "It is reasonable that [he] was charging somewhere

38

between $5,000, which he charged Mr. Lynn, and $65,000; that was for [Gwen Bergman's] trial, so admittedly that would be high. About [$]10– to $20,000, according to the matters in North Dakota, that [Defendant] was charging these clients."[8] Id. at 555. The court seemed receptive to the Government's argument, stating "there is some indication" in the record that Defendant charged his victims between $15,000 and $40,000: "And even if I took the lowest amount, the [$]15,000 per [victim], with the additional 13 [victims] that I have identified here, that would exceed the [$]120,000 that I indicated." Id. at 557–58. Defendant again objected: "Your Honor, that is not proof by a preponderance of the evidence; that is making things up." Id. at 558.

During a brief recess, surely to contemplate what had become an imbroglio, the district court again changed its mind. In purporting to impose a within-guideline range sentence on Defendant, the court first found his relevant conduct involved more than 10 victims resulting, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), in a 2 level increase to his uncontested base offense level of 7. Apparently troubled by the lack of record evidence regarding the disputed loss amount, the court next set that amount at $91,500, based on the loss to only three victims identified in the PSR:

---

[8] The Government added Defendant estimated he earned between $5,000 and $6,500 per month during the relevant period: "Take [$]60,000 a year times however many years the court wants, and that is more than sufficient to sustain the court's loss calculation." Rec. vol. 3, at 559.

> With respect to the amount of the loss, the court wishes the Government had provided it with better direct testimonial evidence. The Court believes that there is sufficient information by which it could easily calculate a reasonable estimate of the loss to exceed $200,000.
>
> * * *
>
> Nonetheless, instead of applying the 10 or 12 point enhancement that this court believes is sufficiently documented, the court will apply a conservative estimate based on the discovery provided by the Government to the Defendant, which included several FBI reports confirming that one victim's loss was [$]35,000, another [$]36,500, and Mr. Stupka's letter indicating that his loss was [$]20,000, for a total loss of [$]91,500.

Rec. vol. 3, at 581–82. This reduced loss figure added 8 levels to Defendant's offense level pursuant to § 2B1.1(b)(1)(E). Consistent with § 3B1.3, the court then added 2 levels for Defendant's abuse of a position of trust. Finally, the district court added a multiple count adjustment of 2 levels under § 3D1.4, to reach an adjusted offense level of 21. Because the court excluded from its calculation of Defendant's offense level all matters the District of North Dakota included as relevant conduct, the court, pursuant to § 4A1.1(a), assessed him 3 criminal history points for his North Dakota sentence. This, coupled with 3 points assessed for his federal false claims convictions under 18 U.S.C. § 287 established a criminal history category III. The court's actual findings resulted in an entirely new guideline range for Defendant of 46 to 57 months imprisonment.

The district court sentenced Defendant to 57 months imprisonment to run consecutively to the 51 month term imposed on him in the District of North Dakota.

The court also imposed a five year term of supervised release on Defendant. As a special condition of that supervised release, the court directed Defendant to obtain the probation office's prior approval of any proposed employment or business ventures. Lastly, the court ordered Defendant to make restitution to seven victims identified in the original PSR "for whom compensation ha[d] not been previously ordered by any court." Rec. vol. 3, at 588–89; see, supra n.7. Defendant renewed his objection to the court's restitution order for "the lack of evidence, the failure of proof." Rec. vol. 3, at 595. Defendant never objected to any of the conditions of his supervised release.

## A.

We review a sentence of imprisonment for reasonableness under an abuse of discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007); see also United States v. Booker, 543 U.S. 220, 261 (2005). Within that milieu, "we review factual findings for clear error and legal determinations de novo." United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006). "The correct Guidelines calculation is . . . the 'natural starting point' from which the sentencing court exercises its discretion under § 3553(a)."[9] United States v. Langford, 516 F.3d 205, 212 (3d Cir. 2008). We

---

[9] Section 3553(a) sets forth various factors that a district court must consider in imposing sentence on a defendant. These "include the nature of the offense and characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the crime, to provide adequate deterrence, to protect the public, and to provide the defendant with needed training or treatment." Kristl, 437 F.3d at 1053 (citing 18 U.S.C. § 3553(a)(1) & (2)). But first, the court "shall consider . . . the
(continued...)

"must first ensure that the district court committed no *significant* procedural error" in calculating the advisory guideline range. Gall, 552 U.S. at 51 (emphasis added). That is, we must determine whether the method by which the court calculated that range is "'procedurally sound.'" Id. "[I]mproperly calculating the Guidelines range, . . . failing to consider the § 3553(a) factors, [or] selecting a sentence based on clearly erroneous facts" are just three examples of likely "significant procedural error." Id. (internal parentheses omitted). We will consider the substantive reasonableness of a defendant's sentence only absent "reversible procedural error." United States v. Lente, 647 F.3d 1021, 1030 (10th Cir. 2011). We deem procedural error not reversible, *i.e.*, harmless, if the record viewed as a whole clearly indicates the district court would have imposed the same sentence had it not relied on the procedural miscue(s). See Williams v. United States, 503 U.S. 193, 203 (1992). In other words, remand is necessary "if the sentence was 'imposed *as a result of* an incorrect application' of the Guidelines." Id. at 202–03 (quoting 18 U.S.C. § 3742(f)(1)).

1.

Defendant is correct when he claims the method by which the district court calculated his guideline range was seriously flawed in at least three respects. First,

[9](...continued)
kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A). This is to say "the Guidelines should be the starting point and initial benchmark" in sentencing. Gall, 552 U.S. at 49.

42

Defendant points out the court erred when it included his federal sentence in North Dakota in its criminal history calculation under U.S.S.G. § 4A1.1, and excluded the offense upon which that sentence was based from its consideration of his relevant conduct under § 1B1.3. To prevent double counting, a court considering a prior sentence as part of a defendant's criminal history cannot consider the offense underlying that sentence as relevant conduct for the purpose of calculating the defendant's offense level. The Guideline's instructions for computing criminal history plainly state that "[t]he term 'prior sentence' means any sentence previously imposed upon an adjudication of guilt . . . for conduct *not part of the instant offense*." U.S.S.G. § 4A1.2(a)(1) (emphasis added). Because the district court did not consider Defendant's offense in the District of North Dakota when calculating his offense level, but instead used the sentence he received there to determine his criminal history category, we "must review the court's underlying [factual] finding that the prior sentence was not part of the instant offense, i.e., that it was not relevant conduct" within the meaning of § 1B1.3. United States v. Wilson, 416 F.3d 1164, 1168 (10th Cir. 2005) (internal quotations omitted). "The [G]overnment bears the burden of proving the prior offense is not relevant conduct." Id.

In determining a defendant's offense level for an instant offense, the district court must account for both the actual conviction and all other relevant conduct: "Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3." U.S.S.G. § 4A1.2 cmt. n.1.

43

Once the court determines the "appropriate offense guideline section," § 1B1.2(b) directs it to "determine the applicable guideline range in accordance with § 1B1.3." Section 1B1.3 provides that where multiple offenses are grouped pursuant to § 3D1.2(d), as they were in Defendant's case, relevant conduct "*shall be determined on the basis of . . . all* [criminal] acts and omissions . . . that were a part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(A) & (2) (emphasis added).

Because Defendant's prior offense in the District of North Dakota arose out of the same ongoing scheme that gave rise to his prosecution in the District of Colorado, the district court had little choice but to find that "[t]he prior offense, the North Dakota conviction, is relevant conduct to the instant case."[10] Rec. vol. 3, at 565. Like Defendant's "instant offense," his "prior offense" includes both "the

---

[10] Section 1B1.3's commentary makes apparent the point:

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as . . . common purpose, or similar *modus operandi*. . . .

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a[n] . . . ongoing series of offenses.

U.S.S.G. § 1B1.3 cmt. n.9(A) & (B).

44

offense of conviction and all relevant conduct under § 1B1.3."[11]  Contrary to what

the district court's finding entailed and what the Guidelines required, however, the

court in calculating Defendant's offense level decided not to include as relevant

conduct "either the crime for which Defendant was convicted in North Dakota, nor

any of the relevant conduct included by the sentencing judge in the North Dakota

case."  Id. at 565–66.  This, the Government concedes on appeal, was error:

> In this matter the Government did contend, and the court did find that [Defendant] engaged in a continuing scheme to represent himself as a licensed attorney and practice law in federal courts throughout the country.  The Government offered no proof at sentencing that the North Dakota offense was unrelated to the scheme, nor did the district court make factual findings specifically distinguishing the facts of the North Dakota case from [Defendant's] Colorado conviction.  The district court simply stated it would not consider the North Dakota case and the related relevant conduct in that case when sentencing [Defendant], and without further findings or evidence. . . .  [T]his was error.

(internal record citations omitted).  But why did the district court indulge such clear

error—an error that resulted in an incorrect increase in Defendant's criminal history

category from II to III?  This question conveniently brings us Defendant's second

---

[11]  The commentary to the Guidelines' "Application Instructions" in relevant part defines the term "offense" to include:

> [T]he offense of conviction and all relevant conduct under § 1B1.3 . . . unless a different meaning is specified or is otherwise clear from the context.  The term "instant" is used in connection with "offense," "federal offense," or "offense of conviction," as the case may be, to distinguish the violation for which the defendant is being sentenced from a prior or subsequent offense.

U.S.S.G. § 1B1.1 cmt. n.1(H).

45

and interrelated claim of procedural error—the imposition of a consecutive sentence.

2.

Defendant rightly claims that in addition to its erroneous criminal history calculation, the district court erred in manipulating the calculation of his offense level so it could ignore U.S.S.G. § 5G1.3(b) and ostensibly impose a within-guideline range sentence on him while running that sentence consecutive to the sentence he received in the District of North Dakota. Section 5G1.3 applies where a court imposes sentence on a defendant who is subject to an undischarged term of imprisonment. Generally, a district court has broad discretion under § 5G1.3(c) in crafting a concurrent or consecutive sentence "to achieve a reasonable punishment for the instant offense." Subsections (a) and (b), however, restrict that discretion. The former requires a consecutive sentence where the defendant committed the instant offense after being sentenced to serve another term of imprisonment. See United States v. Contreras, 210 F.3d 1151, 1152 (10th Cir. 2000). Because subsection (a) does not apply in this case, we turn to subsection (b), the "central aim" of which "is to ensure no defendant is punished twice for the same crime." United States v. Contreras-Martinez, 409 F.3d 1236, 1239 (10th Cir. 2005) (internal quotations omitted). Subsection (b) states in relevant part:

> If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense, . . . the sentence for the instant

46

offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

U.S.S.G. § 5G1.3(b)(2).

The district court stated it did "not believe that its decision with respect to the non-applicability of [§] 5G1.3[(b)] in this case is a departure from the Sentencing Guidelines." Rec. vol. 3, at 585. The court's stilted view was a result of its refusal to properly consider Defendant's North Dakota offense as relevant conduct under § 1B1.3(a). As we just explained, the court had no discretion in this particular matter. In calculating Defendant's advisory guideline range, § 1B1.3(a)(1)(A) & (2) required the court to consider that prior offense as part of his relevant conduct rather than the resulting sentence as part of his criminal history. This, in turn, required the court to account for U.S.S.G. § 5G1.3(b)(2) and, absent a variance based on the § 3553(a) factors, impose a concurrent term of imprisonment on Defendant *as part of any sentence within the applicable guideline range.*[12]

---

[12] The commentary to § 5G1.3 reiterates that "[s]ubsection (b) applies in cases in which all of the prior offense (i) is relevant conduct to the instant offense . . . and (ii) has resulted in an increase in the . . . offense level for the instant offense." U.S.S.G. § 5G1.3 cmt. n.2(A). The Government has never suggested (nor did the district court ever suggest) that a *proper* consideration of the relevant conduct the district court in North Dakota deemed a part of Defendant's prior offense—one that accounted for both the number of victims and the losses they sustained—would not affect his offense level. In cases where consideration of relevant conduct does not affect a defendant's offense level, the threat of double punishment does not exist, rendering subsection (b) of § 5G1.3 inapplicable. See United States v. Dunbar, 660 F.3d 54, 56–57 (1st Cir. 2011).

On this point, the Government refuses to concede error, instead insisting in its appellate brief that the district court's "thorough and individualized analysis of the [§] 3553(a) [factors] and why they support a consecutive sentence . . . does not cause a 'non-Guideline sentence' and thus no procedural error occurs." The Government cites no pertinent § 5G1.3 authority for this proposition and we have found none. At best the Government's argument is disingenuous, as evidenced by the position it took on § 5G1.3's application before the district court. In its supplemental sentencing memorandum, the Government acknowledged: "§ 5G1.3(b) applies and the court *must* take that into account in computing the applicable guideline range for [Defendant]." Rec. vol. 1, at 140 (emphasis added). The court too acknowledged at the preliminary sentencing hearing that a proper calculation of Defendant's guideline range required it to account for U.S.S.G. § 5G1.3(b). What matters, however, is that in the end the district court committed procedural error when it purported to impose a within-guideline sentence on Defendant without accounting for subsection § 5G1.3(b).

3.

This brings us to Defendant's third claim of procedural error. Defendant correctly posits the court erred in calculating the amount of loss associated with his relevant conduct. Recall the court increased Defendant's offense level by 8 pursuant to U.S.S.G. § 2B1.1(b)(1)(E), based on its contested finding that the actual loss to three victims of his scheme totaled a mere $91,500 (in contrast to the PSR's

48

contested statement that twelve victims of his scheme lost a total of $324,769).[13] But the Government apparently never charged Defendant with criminal misconduct related to the three individuals whose losses the court included in its loss calculation. And the district court in North Dakota did not consider those losses as part of Defendant's relevant conduct there. Consequently, before the court could include those individual losses as part of Defendant's relevant conduct within the meaning of § 1B1.3, the Government first had to prove by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme to engage in the unauthorized practice of law and (2) constituted a criminal offense under a federal or state statute. See United States v. Griffith, 584 F.3d 1004, 1013 (10th Cir. 2009); see also U.S.S.G. § 1B1.3 cmt. background ("Conduct that is not formally charged . . . may enter into the determination of the applicable guideline sentencing range."). Assuming the Government met its initial burden of proving relevant conduct, it then had to prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence. See United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002).

---

[13] Under subsection (b)(1), "loss is the greater of actual or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." Id. cmt. n.3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense." Id. cmt. n.3(A)(ii).

Our review of the record reveals the Government failed to meet its burden of proof in all respects. Of the three victims the district court considered in assessing the amount of loss for purposes of § 2B1.1, the court mentioned only Edwin Stupka by name. The court failed to name the other two victims, instead stating "several FBI reports confirm[] that one victim's loss was [$]35,000, another [$]36,500." Rec. vol. 3, at 582. The court also referred to a "letter indicating that Mr. Stupka's loss was [$]20,000." Id. Unfortunately, neither the court nor the Government ever entered the FBI reports or the letter into the record. And of course, the court's statements do not constitute *proof* that the actual losses to the three individuals arose from Defendant's relevant conduct. To be sure, the PSR identified Stupka as losing $20,000, and indicated an individual by the name of Wayne Milton lost $36,500. But the PSR identified none of Defendant's victims as losing $35,000. Moreover, the record evidence fails to substantiate any of these three loss amounts. Aside from the $5,000 loss to Richard Lynn—which the district court did not include in its amount of loss finding—the Government's *proof* regarding the loss, actual or intended, to the victims of Defendant's scheme unaccounted for in North Dakota also fell woefully short. See, supra n.7. The record simply does not support the court's factual findings underlying its calculation of the amount of loss. The likelihood that certain facts bearing upon Defendant's offense level exist, no matter how probable, does not relieve the Government of its burden, after proper objection, to establish their actuality.

50

4.

All that remains for us to consider in connection with Defendant's 57 month sentence on the grouped wire fraud and false statements counts is the Government's assertion of harmless error. The question is whether the district court's numerous procedural errors in sentencing Defendant so affected his substantial rights that Fed. R. Crim. P. 52(a) requires resentencing on the grouped counts. Subsection (f)(1) of 18 U.S.C. § 3742 states that where a "sentence was imposed . . . as a result of an incorrect application of the guidelines, the court shall remand the case for further sentencing proceedings." In Williams, the Supreme Court explained that "[w]hen a district court has not intended to depart from the Guidelines, a sentence is imposed '*as a result of*' an incorrect application of the Guidelines when the error results in the district court selecting a sentence from the wrong guideline range." Williams, 503 U.S. at 203; see also Lente, 647 F.3d at 1037–38 ("A harmless error 'is that which did not affect the district court's selection of the sentence imposed.'"). We subsequently opined that unless the district court indicated at sentencing that the sentence imposed would be the same under multiple sentencing approaches, one of which was the correct approach, "we are compelled to remand for resentencing when we find . . . that an improper offense level [or criminal history category] was applied." United States v. Urbanek, 930 F.2d 1512, 1516 (10th Cir. 1991). Absent such an indication in the record, we have no way of knowing whether the district court would have imposed the same sentence under a proper application of the

51

Guidelines.  See Williams, 503 U.S. at 203.  "[T]o say that the district court would have imposed the same sentence given [a] new legal landscape . . . places us in the zone of speculation and conjecture—we simply do not know what the district court would have done . . . ."  United States v. Labastida-Segura, 396 F.3d 1140, 1143 (10th Cir. 2005).

The Government has the burden of establishing by a preponderance of the evidence that the district court's procedural miscues were harmless.  Lente, 647 F.3d at 1037.  To that end, the Government tells us in its brief:

> If the North Dakota relevant conduct had been considered as part of the relevant conduct loss calculation in this case, the presentence report's original calculation of a loss of $324,726 would have been accurate.  Accordingly, treating the North Dakota offense as relevant, rather than as a prior conviction, would have increased [Defendant's] base offense level by two levels, pursuant to § 2B1.1(b)(1)(G), to a total base offense level of 26 instead of 24.  This combined with the reduction of his criminal history category from a level III to a level II would have provided a recommended guideline range of 70-87 months, well above the 57 month sentence ultimately imposed.

(internal record citations omitted).  The Government's argument misses the mark.  First, the Government simply assumes the original PSR's statement regarding the amount of loss is accurate.  But the Government offered no evidence at trial or sentencing to substantiate that loss amount.[14]  See United States v. Orr, 567 F.3d 610,

_____

[14] The record before us establishes, at most, a loss amount of $167,750.  This amount consists of the $5,000 loss to Lynn and the $162,750 loss considered a part of Defendant's relevant conduct and prior offense in North Dakota.  See Kieffer, 621 F.3d at 834 ("The district court found Kieffer intended the victims to suffer losses
(continued...)

617–18 (10th Cir. 2009) (explaining a district court's findings regarding contested facts in the PSR are insupportable where the Government fails to present "evidence to substantiate the allegations at the time of sentencing"). Second, the Government ignores the elephant in the room. The district court ordered Defendant's 57 month sentence to run consecutively to the sentence he received in the District of North Dakota. But we well know that given U.S.S.G. § 5G1.3(b), a *properly calculated* within-guideline range sentence would likely need to run concurrently with that prior sentence, and would likely not, contrary to the Government's claim, result in Defendant's imprisonment "well above the 57 month sentence ultimately imposed." See, supra n.12.

All this is not to say procedural error in calculating an advisory guideline sentencing range can never be harmless. But where the beginning point for a sentencing court's analysis of the § 3553(a) factors is *measurably* wrong, the ending point usually will result from an incorrect application of the Guidelines. See Langford, 516 F.4d at 217. Contrary to § 3553(a)(4), "[a]n erroneous calculation of the Guidelines will frustrate the sentencing court's ability to give meaningful consideration to 'the kinds of sentence and the sentencing range established for . . . the applicable category of defendant as set forth in the guidelines.'" Id. at 212; see also United States v. Anderson, 526 F.3d 319, 329 (6th Cir. 2008) ("If the premise

---

[14](...continued)
totaling 162,750."). In resentencing Defendant, the district court may consider this loss amount a baseline for the purpose of calculating Defendant's offense level.

53

from which the district court must begin its sentencing analysis is incorrect, then it seems that an appellate court would have a difficult time saying that the result would have been unchanged." (internal citation omitted)).

In this case, the record reflects that by the time of Defendant's actual sentencing, the district court had decided to sentence him within the advisory guideline range.[15] The court then proceeded to calculate Defendant's guideline range incorrectly on the basis of numerous procedural errors, both factual and legal. As a result, the court selected a sentence from the wrong guideline range. Most importantly from Defendant's standpoint, that range failed to account for the concurrent sentencing provisions of § 5G1.3(b)(2). See Williams, 503 U.S. at 203. The court provided no indication whatsoever that it would have imposed the same sentence under a proper application of the Guidelines. See Urbanek, 930 F.2d at 1516. Accordingly, we must vacate Defendant's sentence on Counts I and II of the superceding indictment and remand for resentencing.

## B.

Apart from the district court's erroneous calculation of his guideline range, Defendant objects to its order of restitution. The court ordered Defendant to make

---

[15] After the preliminary sentencing hearing, the court never again suggested that it might impose an outside-the-Guidelines upward variance on Defendant. But even if it had done so, the fact remains that such a variance would have been based on an erroneous consideration of the § 3553(a)(4) factor. See, supra n.9. Whether that alone would render the variance unsustainable we need not decide today.

restitution in the total amount of $152,019 to the following individuals: Donald Sturgis ($3,519); Edwin Stupka ($20,000); Victor Souaid ($32,000); Richard Lynn ($5,000); Michael Danton ($40,000); Wayne Milton ($36,500); and Mark Anthony Roberts ($15,000). In his objections to the original PSR, Defendant stated that "[a]s to the seven individuals listed as victims in the instant case for whom restitution was not ordered in North Dakota, [Defendant] denies that they are victims *or* entitled to any restitution." Rec. vol. 5, at 4 (emphasis added). Defendant subsequently renewed his objections at sentencing. See Rec. vol. 3, at 594–95.

In cases of fraud or deceit, the Mandatory Victims Restitution Act (MVRA) requires a sentencing court to order "that the defendant make restitution to the victim of the offense."[16] 18 U.S.C. § 3663A(a)(1). The MVRA defines a victim as "any person directly harmed by the defendant's criminal conduct in the course of [a] scheme, conspiracy, or pattern [of criminal activity]." Id. § 3663A(a)(2). The court must "order restitution to each victim in the full amount of each victim's losses as determined by the court." Id. § 3664(f)(1). While "a restitution order must be specific in a dollar amount that is supported by the evidence in the record[,] . . . the determination of an appropriate restitution is by nature an inexact science, so that

---

[16] The MVRA does not apply in cases of fraud or deceit where the court finds "from facts on the record, that . . . determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); see also U.S.S.G. § 5E1.1(a) & (b).

absolute precision is not required." United States v. James, 564 F.3d 1237, 1247 (10th Cir. 2009) (internal brackets, citation, and quotations omitted). "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by a preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § §3664(e).

On appeal, Defendant contends the district court's order of restitution was improper because the Government proved neither (1) that the seven individuals awarded restitution were "victims" of his "criminal conduct" within the meaning of the MVRA nor (2) that six of those individuals suffered any loss. The lone exception to Defendant's latter objection is Richard Lynn's $5,000 loss. Where a defendant preserves his objection to a district court's order of restitution, which Defendant undoubtedly did in this case, we review the ultimate legality of that order de novo, but any underlying factual findings only for clear error. Griffith, 584 F.3d at 1019. Assuming the legality of the order, we will not disturb the actual amount of restitution imposed absent an abuse of discretion. Id.

As to the actual amounts of restitution, the Government conceded at oral argument that "the factual basis, the only thing the Government presented was the testimony regarding Mr. Lynn." Thus, the Government admits no factual basis exists in the record for the other amounts the court included in its restitution order. Similarly, in its brief, the Government makes no serious attempt to establish that it

56

met its burden of proving any of the individuals the court deemed entitled to restitution were "victims" of Defendant's "criminal conduct" within the meaning of the MVRA. Accordingly, the district court's order of restitution fails for lack of proof.

C.

Finally, Defendant objects to the district court's imposition of a special condition of supervised release which reads: "Any employment or business ventures by the [D]efendant must be approved in advance by the probation officer." Rec. vol. 1, at 166. Both parties agree Defendant did not object to this condition of supervised release before the district court, so he has the burden of establishing plain error. See Olano, 507 U.S. 732–37; see also supra at 26–28. Federal law, specifically 18 U.S.C. §§ 3563(b)(5) & 3583(d) and U.S.S.G. § 5F1.5, authorizes the imposition of such condition under appropriate circumstances. In United States v. Wittig, 528 F.3d 1280, 1286–89 (10th Cir. 2008), we set forth a thorough explanation of the law related to occupational restrictions during a term of supervised release, and we need not repeat that here. Suffice to say that in this case, any error the district court *may* have committed by placing occupational restrictions on Defendant during his period of supervised release is hardly "clear or obvious, rather than subject to reasonable dispute." Puckett, 556 U.S. at 135.

The original PSR tells us that Defendant's history of fraudulent and deceitful conduct is rather lengthy. In addition to his convictions for making false federal tax

57

refund claims, Defendant has been in trouble for, among other things, possessing stolen checks; possessing stolen property; possessing bad checks; improperly using an employer's credit card; improperly using a former employer's credit card; and forging a deed and using the resulting "equity" on the property to obtain a loan. All these offenses occurred before Defendant embarked on his decade long (or longer) "legal career." To be sure, the court at sentencing failed to "provide at least generalized reasons for imposing [the] special condition[] of supervised release" on Defendant. United States v. Smith, 606 F.3d 1270, 1283 (10th Cir. 2010). The court, however, could easily have found the condition requiring the probation office's preapproval of Defendant's future employment and business opportunities was "linked to the offense [of conviction] and [was] no broader than necessary to rehabilitate the defendant and protect the public," without constituting an undue deprivation of his liberty or property. Id. at 1282. This is sufficient to overcome Defendant's objection to the special condition of supervised release on the basis of plain error.

* * *

For all the foregoing reasons, Defendant's convictions are AFFIRMED. Defendant's sentence on Counts I and II of the superceding indictment is VACATED and this matter is REMANDED to the district court for resentencing on those counts not inconsistent with this opinion.