FILED
United States Court of Appeals
Tenth Circuit

February 9, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

No. 14-3279

MARY C. VERNON,

      Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:12-CR-20160-WPJ-1)**

Floyd R. Finch, Jr., of Floyd Finch Law Offices, Blue Springs, Missouri, for Defendant-Appellant.

Katie Bagley, Attorney, Tax Division, Department of Justice, Washington, D.C., (Caroline D. Ciraolo, Acting Assistant Attorney General; Frank P. Cihlar, Chief, Criminal Appeals and Tax Enforcement Policy Section, Tax Division, Department of Justice, Washington, D.C.; Gregory Victor Davis, Attorney, Tax Division, Department of Justice, Washington, D.C.; Barry R. Grissom, United States Attorney, District of Kansas, Of Counsel; with her on the briefs), for Plaintiff-Appellee.

Before **KELLY, BRISCOE** and **HARTZ**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendant Mary Vernon was convicted by a jury on five counts of attempted tax evasion, in violation of 26 U.S.C. § 7201. Vernon was sentenced to a total term of imprisonment of 41 months, to be followed by a three-year term of supervised release, and ordered to pay $311,157 in restitution to the Internal Revenue Service. Vernon now appeals her convictions and sentences. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

*Factual background*

*a) Vernon's work as a physician*

Defendant Vernon is a physician licensed to practice in the State of Kansas. From 1980 to approximately 2007, Vernon worked in private practice at Lawrence Family Practice in Lawrence, Kansas. During that time period, Vernon developed interests in bariatric and geriatric medicine and pursued professional opportunities in both. In 2004, Vernon co-authored a book with the late Dr. Robert Atkins entitled "Atkins Diabetes Revolution." Thereafter, Vernon provided consulting services to Atkins Nutritionals, a company formed to promote the low-carbohydrate diet developed by Dr. Atkins. Vernon also worked as the medical director for several nursing home facilities in the northeast Kansas area. Finally, Vernon provided consulting services to various entities, including the University of Kansas.

2

*b) The Internal Revenue Service's pursuit of unpaid taxes for 1991 through 1997*

In April 1999, the Internal Revenue Service (IRS) assigned Revenue Officer Joni Broadbent to collect from Vernon unpaid taxes for the 1997 tax year. Broadbent was subsequently assigned by the IRS to collect from Vernon unpaid taxes for the tax years 1991 through 1996. Although Vernon filed a tax return for 1997, she did not file a tax return for the years 1991 through 1996. Together, the unpaid taxes, penalties and interest for the tax years 1991 through 1997 totaled $1,432,299.38.

In attempting to collect this amount from Vernon, Broadbent first sent letters to Vernon and attempted to call her. Vernon, however, did not respond to Broadbent. As a result, Broadbent issued levies to Lawrence Family Practice and to two banks where Vernon maintained accounts. Because these levies did not result in full payment of the amount owed by Vernon to the IRS, Broadbent went to Vernon's place of business at Lawrence Family Practice, made contact with Vernon, and demanded full payment.

Vernon did not make full payment at that point and instead hired an accounting firm to prepare a financial statement for the IRS and to prepare and submit to the IRS late returns for the years 1991 through 1996. After processing the late returns, the IRS adjusted the amount owed by Vernon downwards to approximately $1.1 million.

On December 7, 2000, Broadbent sent Vernon a letter demanding that she make full payment of the amount owed to the IRS by December 21, 2000. Vernon did not, however, comply with this deadline. Broadbent responded by levying various investment and retirement accounts that Vernon held. Because those levies did not result in full payment, Broadbent sent a letter to Vernon on July 19, 2001, advising her that the IRS would begin seizing personal and real property to attempt to satisfy the outstanding tax liabilities.

Vernon hired attorney Jodde Lanning to represent her. Broadbent met with Lanning and learned of two additional assets of which she had been unaware: a retirement account owned by Vernon and a pending lawsuit that Vernon had filed against the Hospital Corporation of America (HCA).[1] Broadbent levied the retirement account and later levied the settlement funds ($270,000) that Vernon received as a result of her lawsuit against HCA.

Broadbent met in person with Vernon and Lanning on December 18, 2002, and obtained from Vernon a Collection Information Statement that purportedly listed all of Vernon's assets. The only real property that Vernon listed on the Statement was her personal residence, located on Country Club Terrace in Lawrence, Kansas.

---

[1] According to the record, HCA was interested in building a new hospital in Lawrence and, as part of its plan to build that hospital, had entered into a contract with Lawrence Family Practice and its physicians. At some point HCA decided not to build the hospital and allegedly breached its contract with Lawrence Family Practice and Vernon.

4

Broadbent sought and obtained judicial approval to seize Vernon's residence. On October 14, 2004, the IRS officially seized Vernon's residence. At that time, the amount of Vernon's unpaid taxes was approximately $543,015.11. The federal tax lien was eventually released so that Vernon could sell the residence without encumbrance. Vernon, unbeknownst to Broadbent and the IRS, arranged for her domestic partner, Sara Wentz, to purchase the residence for a price of $250,000.[2] The proceeds from the sale went to the IRS, but did not satisfy Vernon's tax liability in full.

*c) Rockledge Medical Services*

In January 2003, Vernon approached Lanning about setting up a business entity. According to Lanning, Vernon expressed an interest in separating potential liability issues that might arise from her medical practice from the other business and consulting activities she was engaged in, such as her work with Atkins and her consulting work for nursing home facilities.

Lanning proceeded to prepare and complete the paperwork necessary to form a Subchapter S corporation called Rockledge Medical Services (Rockledge). Notably, Rockledge was set up, at Vernon's direction, so that Wentz would be its sole shareholder, officer and director. Lanning explained to Wentz that, because

---

[2] Broadbent knew that Wentz purchased the residence, but did not know that Wentz was Vernon's domestic partner, or that Vernon arranged the logistics of the sale. Wentz, for her part, was purportedly unaware of why Vernon had her purchase the residence, or that the sale proceeds went to the IRS.

Rockledge was a Subchapter S corporation, its income would flow through to her as its sole shareholder. The Articles of Incorporation for Rockledge were executed by Wentz on January 27, 2003, and filed with the State of Kansas on January 28, 2003.

According to Lanning, Vernon intended for Rockledge to be the entity through which Vernon's non-private-practice services would be provided. In essence, Vernon would provide professional services on behalf of Rockledge to other entities. Lanning informed Vernon that she would either have to work as an employee or independent contractor of Rockledge and that Rockledge would be obligated to issue to Vernon and the IRS either a W-2 or 1099 form each year. Although Lanning and Vernon discussed how Vernon would be compensated by Rockledge, nothing was finalized in that regard.

After Rockledge was formed, Vernon employed Lanning to review two contracts. The first was a contract, dated September 16, 2003, between Rockledge and the University of Kansas Center for Physical Activity and Weight Management. The second was a contract between Rockledge and Atkins Nutritionals, pursuant to which Vernon would provide consulting services. In communicating with Lanning regarding these contracts, Vernon stated: "I'd rather keep them under Rockledge if I can—as the reason the [IRS] hasn't levied them is that we didn't disclose them." Supp. App. at 275.

In the ensuing months and years, Wentz, at Vernon's direction, signed

6

agreements on Rockledge's behalf with various entities for which Vernon would perform consulting and other services. This included at least one additional contract with Atkins Nutritionals, as well as contracts with various nursing home facilities.

Consistent with the terms of these contracts, Vernon provided services to the contracting entities, purportedly on behalf of Rockledge. But, rather than working for Rockledge as an employee or independent contractor as recommended by Lanning, Vernon instead purported to work for Rockledge as a volunteer. The contracting entities would thus pay Rockledge directly for the services provided to them by Vernon. More specifically, all checks from the contracting entities were made out to Rockledge and deposited either by Vernon or Wentz into a bank account designated in Rockledge's name. Rockledge in turn paid no salary, wages or other compensation to Vernon. Consequently, Rockledge did not file with the IRS any W-2s or 1099 forms reflecting payments to Vernon.

*d) The relationship between Vernon, Wentz, and Rockledge*

Vernon and Wentz disregarded corporate formalities in dealing with Rockledge's contracts and finances. Vernon negotiated all of Rockledge's contracts and, once their terms were finalized, directed Wentz to sign them. Although payments made to Rockledge on each contract (some of which were made out directly to Wentz) were deposited into Rockledge's bank account,

7

Vernon exercised control over that account and regularly used proceeds from that account for her personal use.[3] Vernon also routinely used Rockledge's corporate credit card to cover her business and personal expenses. In essence, Vernon treated Rockledge's funds as her own.[4] Wentz, for her part, essentially abdicated control over both Rockledge's corporate funds, as well as her own funds, to Vernon, who she perceived as more skilled at and interested in the couple's finances.[5]

In addition to exercising near-complete control over the couple's finances and those of Rockledge, Vernon also, from time to time, transferred assets into Wentz's name, apparently to keep the IRS from seizing them. For example, as previously noted, Vernon arranged for Wentz to "purchase" Vernon's personal residence on Country Club Terrace in Lawrence. All that Wentz did in connection with the transaction was to sign the documents that Vernon placed before her. According to Wentz, this purported "sale" did not alter in any way the manner in which she and Vernon used the property. Similarly, when Vernon

---

[3] Vernon had internet access to the Rockledge bank account, as well as to her and Wentz's own personal accounts. In addition, Vernon had access to Rockledge's checks and would either sign Wentz's name to them or have Wentz sign them for her.

[4] For example, Vernon, unbeknownst to Wentz, used Rockledge funds to purchase a life insurance contract on behalf of Rockledge, covering Vernon's life, with Vernon's two children named as beneficiaries.

[5] Wentz worked as the director of music and worship at a local church and earned a relatively small salary.

and Wentz moved from their shared residence on Country Club Terrace to a rural residence on Republic Road in Douglas County, Kansas, Vernon arranged for the purchase to be in Wentz's name.

The effect of all of these arrangements was two-fold: to shift income that actually belonged to Vernon to Rockledge and in turn Wentz, and to hide from the IRS assets that might otherwise be seized to pay Vernon's outstanding tax liabilities.

*e) The continuing IRS investigation*

Throughout the entire period of Broadbent's work on Vernon's case, Vernon failed to timely file tax returns as they came due. As a result of Vernon's failure to timely file a tax return for 2002, Broadbent issued a summons for Vernon to appear before her. Vernon failed to appear and Broadbent ultimately obtained a show cause order from a federal magistrate directing Vernon to appear in court on October 14, 2004. Vernon avoided the show cause hearing by filing directly with Broadbent a copy of her 2002 tax return.

Broadbent subsequently instructed Vernon to file her 2005 tax return on or before January 4, 2007, but Vernon failed to do so. This prompted Broadbent to issue a summons for Vernon to appear before her on January 4, 2007. Vernon failed to appear as directed, so Broadbent referred the summons to IRS counsel for enforcement. On April 24, 2007, Broadbent received from Lanning a copy of Vernon's 2005 tax return.

9

As part of her investigation of Vernon, Broadbent searched through local real estate records and discovered that Vernon was connected to a piece of property located on north Kasold Road in rural Douglas County (the farm property). Notably, the farm property was not held by Vernon directly, but rather was owned by MCV, Limited, a limited liability corporation connected to Vernon.[6] Vernon had not previously disclosed the existence of the farm property, or her connection to that property, to Broadbent and the IRS. Broadbent sought and received approval from IRS counsel to issue a lien against the farm property. Later, on June 28, 2007, Broadbent seized the farm property on behalf of the IRS. As of that date, Vernon still owed the IRS $108,106.86 in back taxes, penalties and interest (this figure did not include taxes for Rockledge-related income that Vernon had failed to report). Vernon paid this amount in full before the farm property could be sold by the IRS.

In the fall of 2009, Vernon hired a professional tax preparer to prepare tax returns for herself, Wentz, and Rockledge for the tax years 2004 through 2009 (excepting, apparently, the 2005 tax return previously filed by Lanning on Vernon's behalf). The tax preparer reported all of Rockledge's income on Wentz's tax returns. In doing so, however, the tax preparer did not audit

[6] The record does not indicate when or how MCV, Limited was created. The record does indicate, however, that at some point during the course of the IRS's investigation, the Kansas Turnpike Authority and Douglas County paid to MCV, Limited certain amounts for temporary and permanent easements on the farm property, and that Vernon did not report receipt of these amounts to the IRS.

Rockledge or otherwise attempt to determine who was controlling Rockledge's assets.

At some point, the IRS began investigating Vernon from a criminal standpoint. And that investigation ultimately led to the indictment that was issued in this case.

*Procedural background*

On December 19, 2012, a federal grand jury indicted Vernon on five counts of attempted tax evasion, covering the tax years 2004 through 2008, in violation of 26 U.S.C. § 7201, and one count of making a false statement to a bank, in violation of 18 U.S.C. § 1014. This latter count was subsequently dismissed before trial pursuant to the government's motion. Each of the five counts of attempted tax evasion alleged, in pertinent part, that Vernon: (1) filed a fraudulent federal income tax return on which she understated her total income; (2) negotiated and signed, or caused Wentz to sign, contracts between Rockledge and other businesses for consulting and other services to be provided personally by her; (3) directed the contracting businesses to make checks payable to Rockledge and to transfer funds to Rockledge's bank account for services that she personally provided; (4) deposited or caused to be deposited into Rockledge's bank account checks payable to Rockledge for services that she personally provided; and (5) used the Rockledge bank account to pay for personal expenditures.

The case proceeded to trial beginning on March 18, 2014. After seven days

11

of testimony, the jury convicted Vernon on all five counts of attempted tax evasion. The district court subsequently sentenced Vernon to 41 months' imprisonment on each count, to be followed by three years of supervised release, with the sentences to run concurrently. The district court also ordered Vernon to pay $311,157 in restitution to the IRS.

## II

Vernon raises four issues on appeal. The first two issues pertain to the district court's denial of Vernon's motion for judgment of acquittal. The third issue challenges the district court's jury instructions. The fourth and final issue challenges the district court's calculation of Vernon's sentence. As discussed in greater detail below, we find no merit to any of these issues.

### *Issues I and II*

In her first and second issues on appeal, Vernon contends that the district court erred in denying her motion for judgment of acquittal.[7] "We review the denial of a motion for judgment of acquittal, and hence the sufficiency of the evidence to support the jury verdict, de novo." United States v. Sparks, 791 F.3d 1188, 1190 (10th Cir. 2015). In doing so, "we view the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt." Id. at 1190-

---

[7] Vernon also purports, in both Issues I and II, to challenge the district court's entry of judgment on her convictions.

12

91.

All five of Vernon's convictions for attempted tax evasion arose under 26 U.S.C. § 7201. Section 7201 provides, in pertinent part, that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . ." The essential elements of § 7201 are (1) willfulness, (2) the existence of a tax deficiency, and (3) an affirmative act constituting an evasion or attempted evasion of the tax. Boulware v. United States, 552 U.S. 421, 424 & n.2 (2008).

Vernon argues, in both Issues I and II, that the government's evidence was insufficient to support her § 7201 convictions. But she does not specify which of the three essential elements she believes the government failed to prove. Instead, both Issues I and II focus on certain legal doctrines that the government relied on at trial to establish the first and second essential elements (willfulness and the existence of a tax deficiency) of the charged crimes.[8] In Issue I, Vernon argues that the government's use of these doctrines violated her due process rights because "[n]o statute passed by Congress and signed by the President criminalizes [her] conduct . . . based on the unprecedented extension of civil law doctrines . . .

---

[8] We presume that Vernon is implicitly arguing in Issues I and II that the government failed to prove the elements of willfulness and the existence of a tax deficiency (i.e., that the income was attributable to her rather than Rockledge and that, in turn, she was responsible for paying taxes on the income).

13

to a legitimate Subchapter S corporation owned by [her domestic] partner." Aplt. Br. at 28. In Issue II, Vernon argues that "[t]he prosecution never proved that" she "had knowledge of civil tax collection concepts developed exclusively in case law such that she would realize that following the advice of her tax attorney and working as a volunteer could be found by a jury 11 years later to constitute tax evasion justifying her imprisonment." Id.

### a) The legal doctrines argued by the prosecution

Vernon argues that the prosecution, in attempting at trial to prove the elements of willfulness and the existence of a tax deficiency, improperly relied on four separate legal doctrines. Here are her specific challenges to each:

#### 1) Sham corporation

According to Vernon, the government's primary argument at trial was that Rockledge was a sham corporation. But, Vernon argues, the evidence presented at trial established that Rockledge is a valid Subchapter S corporation. In support, Vernon notes that Wentz signed contracts on behalf of Rockledge and that, pursuant to those contracts, Rockledge "received hundreds of thousands of dollars of taxable income—legally taxable to . . . Wentz as the sole shareholder" under the tax code. Aplt. Br. at 34. And, Vernon asserts, an "IRS Revenue Agent . . . admitted [at trial that Rockledge] was a profitable corporation." Id. at 34-35. In short, Vernon argues, Rockledge "entered into contracts, generated substantial profits, and had assets in the bank." Id. at 36. Consequently, she argues, "[i]t

14

was not just a shell with no business activity," and "the statutory law is that . . . Wentz owes the tax, not [Vernon]." Id. For these reasons, Vernon argues, the district court "should have granted [her] motion for judgment of acquittal." Id.

### 2) Assignment of income

Vernon argues that the government also claimed that "the creation of [Rockledge] to contract for [her] services was by definition an 'assignment of income.'" Id. at 37. "But that" claim, Vernon argues, "begs the legal question of whose income it was when the [Rockledge] contracts were entered into *before* the services were performed." Id. (emphasis in original). According to Vernon, because the contracting entities, such as Atkins and the nursing facilities, "paid [Rockledge] for services . . . Vernon provided *after* the contracts were signed, . . . the income belonged to [Rockledge] under the contracts, not to [Vernon]." Id. (emphasis in original; internal quotation omitted). In other words, Vernon argues, "[u]nder statutory tax law, the income of [Rockledge] was deposited in the bank account of a validly-formed corporation, and the net income from [Rockledge] flowed through to . . . Wentz, as her 2003 and 2008 tax returns reported." Id. at 38. "The prosecution," Vernon argues, "can't simply ignore the tax code when it wants to charge someone with evasion." Id. To do so, she argues, "violates due process." Id.

### 3) Alter ego

Vernon further argues that the prosecution improperly employed "the

15

concept of 'alter ego,' and the trial court obligingly included the phrase in its instruction No. 8." Id. at 39. Vernon argues that the alter ego doctrine, which "addresses whether a *shareholder* so controls the corporation *she owns* that the corporate form should be disregarded," had no applicability in this case because she "was not an owner of" Rockledge. Id. (emphasis in original). Indeed, Vernon argues, "it is unprecedented to claim that a Kansas corporation can be so controlled by one who does not own it, and who is not an officer of the corporation, that it becomes the 'alter-ego' of the non-owner." Id. at 40. In the end, Vernon argues, "[t]his novel extension of the alter-ego doctrine should not be the basis for criminal liability," and "[t]he trial court should have granted [her] motion for judgment of acquittal on this theory." Id.

*4) Substance over form*

The fourth and final doctrine relied upon by the government, Vernon complains, was the "substance over form" doctrine, "where tax practitioners look at the substance of transactions where there is a difference between substance and form." Id. at 40. That doctrine, Vernon argues, "does not apply here for the fundamental reason that the substance of the Atkins-[Rockledge] and the nursing home-[Rockledge] transactions accorded with the form: Atkins and the nursing homes had written contracts with [Rockledge] and paid [Rockledge] pursuant to those contracts." Id. at 41. In other words, Vernon argues, Rockledge "was set up as a legitimate corporation under Kansas law for a business purpose" and,

16

"[f]or this reason alone, the substance over form argument can not [sic] apply as a matter of law." Id.

*b) Analysis*

Vernon's arguments fail on all accounts. At bottom, Vernon's arguments all rest on her assertion that, as a matter of historical fact, Rockledge was formed and subsequently operated as a legitimate Subchapter S corporation. In support, Vernon focuses on three undisputed facts: (1) that Rockledge itself, rather than Vernon, entered into the various contracts at issue; (2) the contracting entities paid Rockledge for the work performed by Vernon; and (3) those proceeds were deposited into Rockledge's bank account.

But Vernon ignores the evidence that would have allowed the jury to reasonably find that she personally exercised complete control over Rockledge's operations and finances. More specifically, the government's evidence established that Vernon arranged for the creation of Rockledge by hiring attorney Lanning to prepare the corporate documents and in turn directing Wentz to sign those documents. Once Rockledge was formed, it was Vernon, rather than Wentz, who decided what contracts Rockledge would enter into and what the terms of those contracts would be. And although the payments under the contracts were deposited into Rockledge's bank account, it was undisputed that Vernon had full access to, and in fact routinely exercised control over, the funds in Rockledge's bank account (both by way of internet access and by directing Wentz to sign

17

checks on Rockledge's account). Indeed, the government's evidence indicated that it was Vernon who controlled the finances of her and Wentz, including the Rockledge account. Further, it is undisputed that Vernon routinely used the funds from Rockledge's bank account to pay her own personal expenses. In addition, Vernon occasionally used Rockledge's bank account to pay employees of her medical practice. In sum, the government's evidence established that Vernon exercised complete and total control over Rockledge and its bank account, rendering Rockledge simply a conduit through which she derived personal income.

As for Vernon's challenge to the government's reliance on the alter ego doctrine, she is wrong in suggesting that this doctrine is applicable only to the named owners of a corporation. Although there are relatively few cases addressing the issue, the weight of authority clearly indicates that where, as here, a non-owner is allowed by the nominal owner to dominate and control the corporation at issue, the corporation can be treated as the non-owner's alter ego.[9]

_____

[9] Vernon suggests that we must look solely to Kansas law to determine whether the alter ego doctrine applies under these circumstances. But she points to no case law to support her position. And, in any event, we conclude she is incorrect. Because this is a federal criminal case, the applicability of the alter ego doctrine under these circumstances is a matter of federal common law, not Kansas state law. See generally Lewis v. United States, 517 F.2d 236, 237 (9th Cir. 1975) ("In determining the federal law of privilege in a federal question case, absent a controlling statute, a federal court may consider state privilege law. But the rule ultimately adopted, whatever its substance, is not state law but federal common law."); Note, Piercing the Corporate Law Veil: The Alter Ego Doctrine

(continued...)

18

For example, in <u>Foxworthy, Inc. v. Comm'r</u>, 98 T.C.M. (CCH) 177, 2009 WL 2877850 (2009), <u>aff'd</u>, 494 F. App'x 964 (11th Cir. 2012), the taxpayer used a corporation formed and owned by his attorney to hold the taxpayer's personal residence and enter into fictitious leases with entities owned by the taxpayer in order to deduct the taxpayer's personal living and other fictitious expenses.  The tax court concluded, and the Eleventh Circuit subsequently agreed, that it was proper under these circumstances to "disregard [the corporation] and treat it as" the taxpayer's "alter ego" for federal tax purposes.  2009 WL 2877850 at *18; 494 F. App'x at 965.  Other cases and treatises, although limited in number, agree with this conclusion.  <u>See</u> <u>Establissement Tomis v. Shearson Hayden Stone, Inc.</u>, 459 F. Supp. 1355, 1366 n.13 (S.D.N.Y. 1978) (holding that non-owner of corporation may be held as alter ego when he exercised control over the corporation and 100% of the stock was held in his wife's name); <u>Matter of Flanzbaum</u>, 10 B.R. 420, 424 (Bankr. S.D. Fla. 1981) ("Here it could be no more clear that while the stock of Suerich Enterprises, Inc. was reissued in the name of Defendant, Ronald A. Fisher, the corporation continued to be run by and for the benefit of the Debtor, Richard Flanzbaum.  The Court thus finds that Defendant, Suerich Enterprises, Inc., is the alter ego of the Debtor, Richard Flanzbaum, and

[9](...continued)
<u>Under Federal Common Law</u>, 95 Harv. L. Rev. 853 (1982) (arguing that federal common law need not mirror state law, because "federal common law should look to federal statutory policy rather than to state corporate law when deciding whether to pierce the corporate veil").

the assets thereof should be applied as assets of the estate herein."); Carter G. Bishop, Daniel S. Kleinberger, Limited Liability Companies: Tax and Business Law, ¶ 6.03 Limits of the Shield: Piercing The Veil (2015) ("Practically, the chances are slim that owners will permit a non-owner to so dominate the entity as to turn the entity into non-owner's alter ego or instrumentality—unless the formality of ownership is itself a deception and part of the misuse of the entity structure."); Piercing The Corporate Law Veil, supra at 867 ("Domination and control are the crucial factors under the first prong. Thus, the [alter ego] test might be satisfied even in the total absence of ownership, if control were exercised de facto or indirectly.").

In our view, the application of the alter-ego doctrine in these circumstances, as well as the other doctrines relied upon by the government, is consistent with the general underlying principles of federal income taxation, including that "gains should be taxed 'to those who earned them.'" Comm'r v. Banks, 543 U.S. 426, 433-34 (2005) (quoting Comm'r v. Culbertson, 337 U.S. 733, 739-40 (1940)), that taxes cannot "be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it," Lucas v. Earl, 281 U.S. 111, 115 (1930), and "that the Government may look at the realities of a transaction and determine its tax consequences despite the form or fiction with which it was clothed," Hamlin's Trust v. Comm'r, 209 F.2d 761, 764 (10th Cir. 1954).

20

We also conclude there is no merit to Vernon's suggestion that the application of these doctrines violated her due process rights and the *ex post facto clause* of the United States Constitution. Although she does not entirely flesh out either argument, she appears to be asserting that these were all "civil law doctrines" that had never before been applied in the context of a criminal case such as hers. Aplt. Br. at 28. Vernon, however, is clearly wrong on this point.

"To comport with the Due Process Clause of the U.S. Constitution, a law must 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'" United States v. Richter, 796 F.3d 1173, 1188 (10th Cir. 2015) (quoting United States v. Lovern, 590 F.3d 1095, 1103 (10th Cir. 2009)). The statute under which Vernon was convicted clearly meets these requirements (as previously noted, § 7201 makes it a crime for "[a]ny person [to] willfully attempt[] in any manner to evade or defeat any tax imposed by this title or the payment thereof . . . ."). Although § 7201 makes no mention of the specific doctrines relied on by the government in this case, all of those doctrines were simply ways to demonstrate, under the unique facts that Vernon herself created, that Vernon was willfully attempting to evade federal income tax on earnings she received for her work with Atkins and with nursing home facilities. Notably, all of these doctrines have previously been used in criminal tax cases to describe methods individuals have employed to evade the payment of income taxes. Thus, there is no valid basis for Vernon to assert that she did not

21

have fair notice that her conduct, attempted tax evasion, was forbidden by statute.

As for her *ex post facto* argument, the Constitution's *ex post facto clause* prohibits four types of laws: (1) those that make an action done before the passing of the law, and which was innocent when done, criminal; (2) those that aggravate a crime or make it greater than it was when committed; (3) those that inflict a greater punishment for the crime than was in the place at the time the crime was committed; and (4) those that alter the legal rules of evidence and allow for the receipt of less or different testimony than the law required at the time the crime was committed. <u>Carmell v. Texas</u>, 529 U.S. 513, 522 (2000). Presumably, Vernon is asserting that the doctrines relied on by the government fall into the first category (for they clearly do not fit within the last three categories). But Vernon cannot plausibly assert that any of the four doctrines rendered criminal conduct that was previously considered innocent. Rather, Vernon's actions were quite clearly criminal when she committed them.

In sum, we conclude that the evidence presented by the government at trial was more than sufficient to allow the jury to find beyond a reasonable doubt each of the essential elements of § 7201 for each of the five counts of conviction. Consequently, we conclude that the district court properly denied Vernon's motion for judgment of acquittal.

*Issue III*

In her third issue on appeal, Vernon argues that the district court erred in

22

incorporating into its jury instructions the four doctrines relied on by the

government. "'We review de novo the jury instructions as a whole and view them

in the context of the entire trial to determine if they accurately state the governing

law and provide the jury with an accurate understanding of the relevant legal

standards and factual issues in the case.'" Richter, 796 F.3d at 1185 (quoting

United States v. Bedford, 536 F.3d 1148, 1152 (10th Cir. 2008)).

*a) Instruction No. 8*

Instruction No. 8 instructed the jury as follows:

> Under the tax laws of the United States, income is taxed to the person or entity which earns and controls that income. The use of sham entities to avoid tax liability is illegal. Likewise, a taxpayer may not eliminate her tax liability by merely assigning income that the taxpayer earned to someone else, if the taxpayer maintains command over the income.

> In analyzing the evidence presented during the trial, you should keep in mind that the tax consequences of a monetary transaction should be determined by the economic realities and the substance of the transaction, rather than merely by the form or label used to designate the transaction. Income tax consequences under the Internal Revenue Code depend on the substance of the situation, not the form.

> It is your responsibility to judge the facts and determine whether Defendant Vernon improperly assigned her income to Rockledge Medical Services or Rockledge Medical Services was a sham corporation or alter ego of Defendant Vernon, thereby entitling you to ignore the existence of this corporation in determining whether the Government has proved the existence of a tax liability due from Defendant Vernon. To assist you in making this determination, I instruct you as follows:

> If a corporation is organized and established for a purpose that is

23

the equivalent of a business activity or is followed by the carrying on of a business by the corporation, the corporation remains a separate entity.  A Subchapter S Corporation, as a separate entity, would be subject to filing a corporate income tax return, and that income would be included as income of the owner(s).  In order to be a separate entity for income tax purposes, a corporation must be established for a business purposes [sic] and must do business in the ordinary meaning of that term.

   For a corporation to be considered a separate "person" for tax purposes, it must engage in some kind of industrial, commercial or other activity besides avoiding taxation.  Thus, a corporation is not considered a separate entity for income tax purposes if it is merely a paper corporation, existing only to assist an individual to avoid taxation.

   In addition, if a corporation is so controlled by an individual that it is being used by that individual to advance the individual's own personal purposes rather than to achieve corporate goals, the corporation is said to be merely the alter ego of that individual.  This is another way of saying that there is no separation between the corporation and the controlling individual.  When, for example, the controlling individual moves his or her own funds in and out of a corporate account without any regard for which funds belong to the corporation and which belong personally to the individual, then a finding that the corporation is merely a sham corporation is proper.  The corporation is not to be disregarded, however, merely because an individual maintains a detailed direction of corporate affairs.

Aplt. App. at 229-30.

Vernon argues that Instruction No. 8 "adopted the prosecution's proposed definition of 'sham corporation,' misstated the law . . . and unconstitutionally extended the reach of the tax evasion statute in an *ex post facto* fashion to criminalize conduct that—even if true—was not clearly illegal at the time the conduct occurred."  Aplt. Br. at 50.  More specifically, Vernon complains that

24

Instruction No. 8, by using the phrases "individual" and "controlling individual" in defining a "sham corporation," improperly changed and extended criminal law. Id. at 51. According to Vernon, a "sham corporation" can only be found if an "owner" or "shareholder" used the corporation for his or her own purposes. Id. Vernon further argues that "[b]ecause [she] could not have had notice that her conduct violated the law, she could not have formed the specific intent willfully to evade or defeat income taxes." Id. at 50. In other words, Vernon is simply reasserting, in the context of a challenge to Instruction No. 8, the arguments she made in Issues I and II. For the reasons stated above, we conclude that those arguments lack merit.

Vernon also complains, in passing, that Instruction No. 8 "fail[ed] to tell the jury that a corporation cannot be a sham 'so long as the corporation serves any business function or engages in any business activity.'" Aplt. Br. at 52 (quoting Coca-Cola Bottling Co. of Gallup v. U.S., 443 F.2d 1253, 1254 (10th Cir. 1971)). But the holding that Vernon cites was taken from a civil tax case, Coca-Cola Bottling, involving very different facts, i.e., a wholly owned subsidiary that was seeking a refund of federal income taxes on the grounds that it had no employees or bank accounts and was simply operated as a division of its parent company. Moreover, Vernon fails to quote all of the holding from Coca-Cola Bottling: "For federal income tax purposes, a corporation and its stockholders are separate taxable entities so long as the corporation serves any

25

business function or engages in any business activity." 443 F.2d at 1254. Quite clearly, that holding has no relevance here, and the district court did not err in failing to include it in Instruction No. 8. Vernon also ignores the following additional holding from the case, which does have relevance here: "The Commissioner [of Internal Revenue] has greater freedom and responsibility to disregard the corporate entity than does either that corporate entity or its creator." Id.

*b) Instruction No. 7*

Instruction No. 7 discussed the "third [essential] element" of § 7201, i.e., that the defendant "committed some affirmative act" constituting an evasion or attempted evasion of the tax, and it listed the affirmative acts that were alleged in the indictment for each count. Aplt. App. at 226. Vernon complains that certain of "the predicate acts listed in Instruction No. 7," such as "depositing checks payable to [Rockledge] into [Rockledge's] bank accounts and 'causing . . . Wentz to report the [Rockledge] income as her own in 2008," "are not crimes." Aplt. Br. at 52.

We conclude there is no merit to Vernon's argument. While it may be true that some of the predicate acts listed in the indictment and repeated in Instruction No. 7 are innocent if viewed in isolation, the fact of the matter is that the government alleged that they constituted the requisite affirmative act necessary to establish that Vernon violated § 7201. Nothing about this was improper, and the

26

district court did not err in instructing the jury regarding these alleged predicate acts.

*Issue IV*

In her fourth and final issue on appeal, Vernon argues that the district court, at the time of sentencing, erred in calculating the tax loss associated with her crimes of conviction. More specifically, Vernon contends that the district court erred in (a) "imput[ing] 100% of [Rockledge's] net income to [her] when [Rockledge] was a valid corporation and Sara Wentz owed the tax on that income," (b) "conclud[ing] that the 'tax loss' included all taxes, penalties, and interest that [Vernon] owed from the earlier decade," and (c) "conclud[ing] that [Vernon] used 'sophisticated means' by misapplying the 'sham corporation' doctrine." Aplt. Br. at 53 n.31. Because these are each distinct claims, we will address them separately.

"'We review a sentence of imprisonment for reasonableness under an abuse of discretion standard.'" United States v. Rodebaugh, 798 F.3d 1281, 1297 (10th Cir. 2015) (quoting United States v. Kieffer, 681 F.3d 1143, 1164 (10th Cir. 2012)). "'Within that milieu, we review factual findings for clear error and legal determinations de novo.'" Id. (quoting Kieffer, 681 F.3d at 1164).

*a) Imputing all of Rockledge's income to Vernon*

Vernon complains that the district court imputed all of Rockledge's income to her, even though "Wentz acknowledged that her household expenses were paid

27

from [Rockledge]; she got haircuts, traveled, and ate meals on the corporate funds." Aplt. Br. at 54. "Those [Rockledge] funds," Vernon asserts, "went to pay the utilities and mortgage payments on Ms. Wentz's houses." Id. "Thus," Vernon argues, Wentz "received substantial benefits from [Rockledge's] funds, and if the IRS were pursuing these matters civilly, it undoubtedly would allocate some of the [Rockledge] net income to Ms. Wentz." Id. Vernon asserts that "it is an error of law for the IRS to 'run up' the so-called 'tax loss' by attributing *all* of the unpaid taxes to . . . Vernon and *none* to . . . Wentz, who had the duty to file and pay taxes on the [Rockledge] income under" the Internal Revenue Code. Id. (emphasis in original).

In attributing all of Rockledge's income to Vernon, the PSR concluded as follows:

> Because of the on-going collection efforts by the IRS Revenue Officer [related to Vernon's 1991 to 2002 taxes], . . . Vernon established [Rockledge] as a means to conceal her income properly attributable to her. If this income was made known to the IRS, the IRS would levy that income source in order to pay the defendant's significant back taxes. Dr. Vernon also knew that she could not maintain a bank account in her own name at the time, because the IRS would seize the account. Therefore, Vernon used her domestic-partner, Sara Wentz, as a nominee to appear to own and control [Rockledge], and used Wentz's personal bank account to transfer money between the [Rockledge] bank account and Ms. Wentz's account in order to pay personal expenses as needed.

Aplt. App. at 536. Although Vernon objected to this, the district court overruled her objection, noting that the PSR's conclusions were consistent with the jury's

28

verdict.  Id. at 398-99.

In our view, the district court did not err in overruling Vernon's objection and treating all of Rockledge's income as belonging to Vernon.  As previously noted, Vernon exercised absolute control over Rockledge and its assets in order to shield her income from the IRS.  The fact that Vernon allowed her domestic partner to use some of the income does not alter the fact that the income was earned by, and thus properly taxed to, Vernon.

*b) Including in the "tax loss" amounts from earlier years*

Vernon next argues that the district court erred in concluding that the "tax loss" associated with the offense "include[d] $988,522.76 of the taxes, penalties, and interest admittedly collected by the IRS by 2007 for the time period from 1991-2002."  Aplt. Br. at 56.  Vernon argues that "[i]t twists language beyond all meaning to say that taxes collected with full penalties and interest more than four years before an indictment can still constitute a 'tax loss.'"  Id.

The inclusion of this amount in the loss calculation began with the PSR, which noted that "[i]n the time period after January 2003, the IRS collected $988,522.76 from [Vernon] for tax years beginning in 1991, and up to 2002.  The 2003 date is relevant for the purpose of relevant conduct in this case . . . ."  Aplt. App. at 480.  The PSR in turn noted that Vernon formed Rockledge in January 2003, and began channeling income through it.  Id. at 481.  In determining the loss associated with Vernon's offense, the PSR concluded that Vernon's "conduct

29

in this case involved her willful evasion of paying taxes from 2003 through 2010 for federal and state taxes; and willful evasion of . . . taxes, penalties, and interest owing for 1991 to 2002 . . . after January 2003." Id. at 486. In support, the PSR noted that Application Note 2 to U.S.S.G. § 2T1.1 states that "'[i]n determining the total tax loss attributable to the offense, all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated.'" Id. at 485 (quoting U.S.S.G. § 2T1.1, cmt. 2). The district court agreed with these calculations, but concluded that a downward variance was warranted because "the big chunk of" the tax loss "was th[e] [$]988,000 amount based on the tax loss from 1991 to 2002," which the government had ultimately collected from Vernon. Id. at 2641.

As the government correctly notes in its appellate response brief, Vernon does not challenge the district court's finding that she attempted to evade the payment of the taxes, interest and penalties for 1991 through 2002, or its calculation of the amount of those taxes, interest and penalties. Instead, her argument simply boils down to the assertion that this amount should not have been included in the loss calculations because she ultimately paid the government for those taxes, interest and penalties. But, as the government correctly notes, the Sentencing Guidelines define "tax loss" under 26 U.S.C. § 7201 as the intended loss and not the actual loss. U.S.S.G. § 2T1.1(c)(1). Consequently, the fact that

30

Vernon was ultimately forced to pay those back taxes, interest and penalties is irrelevant. Thus, the district court did not err in including this amount in its loss calculations.

*c) Vernon's use of "sophisticated means"*

In calculating Vernon's total offense level, the PSR applied a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(2) for use of "sophisticated means," i.e., Vernon "hid[ing] assets or transactions through a fictitious entity or corporate shell." Aplt. App. at 541.

In the district court, Vernon objected to this enhancement on the grounds that Rockledge "was neither a fictitious entity nor a corporate shell," and instead "had real income, real assets, and a *bona fide* business purpose." Id. at 261. The district court overruled this objection.

On appeal, Vernon does nothing more than state, in a footnote, that it "makes no sense to enhance the Base Offense Level by two points for use of 'sophisticated means' . . . when the basis for that argument—use of a 'sham corporation'—is an error of law under Coca-Cola Bottling Co., 443 F.2d at 1254." Aplt. Br. at 56-57 n.34. This argument is meritless. As previously noted, Vernon has misconstrued our decision in Coca-Cola Bottling. Moreover, the district court's finding that Rockledge was a "sham corporation" is overwhelmingly supported by the evidence presented at trial. Consequently, we conclude that the district court did not err in imposing the two-level "sophisticated means"

31

enhancement.

## III

The judgment of the district court is AFFIRMED.